NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0626n.06

No. 14-1178

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 08, 2015
DEBORAH S. HUNT, Clerk

MARY JANE GROSS and TERRY GROSS, )
)
      Plaintiffs-Appellants, )
)
v. )
)   ON APPEAL FROM THE UNITED
)   STATES DISTRICT COURT FOR THE
CITY OF DEARBORN HEIGHTS et al., )   EASTERN DISTRICT OF MICHIGAN
)
      Defendants-Appellees. )
)
)

BEFORE:    DAUGHTREY, ROGERS, and DONALD, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. In this appeal, we are asked by the plaintiffs, Mary Gross and her husband, Terry Gross, to reverse the district court's grant of summary judgment to the defendants: Officer Nicholas Szopko, Corporal Christopher Pellerito, Officer Michael Fraser, and Sergeant Joanne Beedle-Peer—all members of the Dearborn Heights Police Department—and the City of Dearborn Heights. The Grosses' § 1983 complaint charged the officers with failure to "knock and announce" on entry to their residence and with use of excessive force during Mary Gross's arrest, both in violation of the Fourth Amendment; with unconstitutional retaliation in violation of the First Amendment; and with deliberate indifference to Mary Gross's serious medical needs in violation of the Fourteenth Amendment. They also

claimed that the City was liable based on its "custom, policy and practices," failure to train, and failure to provide medical treatment for Mary Gross's objectively serious injury.

In granting summary judgment to the individual defendants, the district court determined that no genuine dispute of material fact existed as to any of the Grosses' claims against the officers, that the officers had not engaged in any constitutional violations, and that the officers were therefore entitled to qualified immunity. After determining that the individual officers were not liable, the court also granted summary judgment to the City. Because we conclude, to the contrary, that there were genuine disputes of material fact as to at least some of the plaintiffs' claims, we find it necessary to reverse the grant of summary judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

There is no real disagreement as to the preliminary facts in this case. The complaint stems from an incident in August 2012, when Dearborn Heights police officers Officer Nicholas Szopko, Corporal Christopher Pellerito, and Sergeant Joanne Beedle-Peer arrived at the residence of Mary Gross to execute a warrant for her arrest. The warrant, issued by the State of Kentucky, sought her extradition for felony drug-trafficking, even though she was 66 years old at the time and a Michigan resident with no prior arrest history. Dearborn Heights officers had previously attempted to execute the same extradition warrant five months earlier, in March 2012. On that occasion, Mary Gross informed the officers that they were pursuing a case of mistaken identity, that her sister Margaret had used Mary's name to open numerous credit cards in Kentucky, and that the warrant should be for Margaret, not Mary. The officers lacked a mug shot or fingerprints for the person identified in the Kentucky warrant and thus were unable to verify that the warrant was actually for Mary Gross; as a result, they did not arrest her in March.

What is disputed concerns events that occurred when officers returned to the Grosses' residence in August, after receiving another Kentucky extradition warrant in the name of Mary Gross. Included with the warrant were a photograph of Mary Gross and a letter confirming that she was the individual wanted by Kentucky. According to the Grosses, the officers gained entry to the house illegally by misrepresenting their purpose, telling Terry Gross at his back door that a neighbor had called and asked the police department to make a welfare check at his house. An audiotaped recording of the encounter reflects that Officer Szopko, standing outside the door, asked the Grosses to identify themselves. Mary Gross provided her name, but when Officer Szopko told her to come out of the house, she refused.

Because Mary Gross failed to follow Officer Szopko's order, he and the other officers decided to enter the house. From this point on, the parties offer differing accounts as to how the defendants gained entry and what followed once they were inside the kitchen. Terry Gross testified that an officer told him that if he did not open the door, they would "break it down"; that after he unlatched the door, an officer "pulled the door open"; that this officer walked Terry Gross into the kitchen and instructed him to sit down; and that another officer then ran into the house, grabbed Mary's arm and "started pulling on it." He conceded that the officers had knocked on his back door but denied that they had mentioned the arrest warrant until after they entered the kitchen. Officer Szopko testified to a different version of the facts, saying that during his initial conversation with Terry Gross, the back door was propped open; that he spoke with Terry Gross from the threshold of the open door; that he grabbed onto Mary Gross's arm, which was within his reach from the threshold, after advising her of the warrant for her arrest; that Mary Gross pulled her arm out of his grip and, thus, "resisted arrest"; and that he went into the house to get hold of her again. Corporal Pellerito testified that he and Officer Szopko entered the

Grosses' home because, after informing Mary Gross of the warrant for her arrest, she retreated inside the kitchen and declined to come outside.

What happened next is also unclear. Officer Szopko's audiotape recording reflects that after Mary Gross refused to come out of the house, a commotion ensued inside the house. The following was recorded after the initial commotion:

> Mary: I didn't do nothing, I didn't do nothing.
>
> Officer: Come here, Mary, come on out.
>
> Officer: Have a seat, have a seat, have a seat.
>
> Officer: Mary, we have a warrant for your arrest.
>
> Mary: What for? Let me go.
>
> Officer: There's a warrant for your arrest. There's a warrant for your arrest.
>
> Mary: Can I get my clothes on first? Please?
>
> Terry: Let her get some clothes on.
>
> Officer: We'll grab the clothes.
>
> Terry: Let her go in there and put some clothes on.
>
> Officer: Miss, Miss, stop.
>
> Officer: She don't need no clothes.
>
> Mary: Oh, God. [second commotion]
>
> Officer: Don't resist.
>
> Officer: Do not resist.
>
> Mary: You broke my leg. God, oh, oh, oh.
>
> Officer: Don't resist.

The parties also provided versions of the arrest that both aligned with and deviated from the recording. Mary Gross testified that "the first thing [the defendants] did is they came in and they grabbed me and put my face into the utensils hanging on the wall . . . . [A]nd then . . . the big heavy one took my knee and pushed it into the cabinet door thing and broke my knee." She claimed that, after an officer injured her knee, she began to hold onto the sink counter while the officers attempted to take physical custody of her. Terry Gross testified that two officers first handcuffed Mary Gross and "had ahold of her" before they announced that they had a warrant for her arrest. He also said that when Mary Gross asked to get her clothes, the officers refused her request and slammed her into the counter, "forced [her head] down into the dish rack," and "pulled her up and banged her into the counter and broke her leg."

In contrast, Officer Szopko testified that Mary Gross asked for clothing only after she was arrested and handcuffed. He said that in the course of attempting to take custody of her, Mary Gross struggled with Corporal Pellerito by "wrenching her body back and forth and trying to pull her arms away from [them]," that she continued to hold her arms underneath her body while they attempted to handcuff her by against the counter, and that they told her to stop resisting throughout this encounter. Officer Szopko said that Mary Gross was "yelling that it wasn't her . . . that it was her sister." He also testified that he did not recall her saying anything at the house about her leg being broken, although he remembered seeing her limping after they arrived at the jail. Officer Szopko and Corporal Pellerito both denied using any force on Mary Gross beyond grabbing her arm to handcuff her.

After Mary Gross was handcuffed, she was escorted to Sergeant Beedle-Peer's patrol car by Officer Szopko and Corporal Pellerito. How that was accomplished was also disputed by the parties. Mary Gross claimed that she could not walk to the car and was made to hop on one foot.

Just as none of the officers on the scene recalled hearing Mary Gross complain of an injury, no one recalled that she had difficulty getting out of the house and into the patrol car. However, the audiotape recording includes the following exchange between Mary Gross and the officers, occurring after Mary Gross exclaimed that her leg had been broken:

> Mary: Oh, God.
>
> Officer: Instead of putting your weight on your foot, hop.
>
> Mary: My knee's broke.
>
> Officer: Okay . . . .
>
> Officer: Put your butt right down there on the chair.
>
> Mary: Oh, God, my knee's broke.
>
> Officer: Okay, just get yourself back in there, okay?
>
> Mary: Oh, God.

Officer Szopko admitted that after they arrived at the Dearborn Heights jail, he saw Mary Gross limping and heard her say that "her leg, her knee hurt" while he was escorting her inside. Two videotapings of the booking area produced by defendants show Mary Gross limping into the booking area with the assistance of Officer Szopko and Sergeant Beedle-Peer, repeatedly rubbing her knee, and asking Officer Szopko and a booking officer at the jail, Michael Fraser, not to "send [her] anywhere until [she can] go see a doctor to get this fixed." She needed the assistance of Officer Szopko to stand while her booking photos were made, and she was seated in a wheelchair by Officers Szopko before having her fingerprints taken by Officer Fraser. She was then wheeled out of the booking area in the wheelchair.

Mary Gross was held at the Dearborn Heights jail for over 15 hours and incarcerated in the Wayne County Jail for five days. Eventually, Kentucky officials realized that it was, in fact,

Mary Gross's sister, Margaret, who was wanted in Kentucky, and Mary Gross was released from custody. She was wheeled from her cell to the jail's exit in a wheelchair and carried by Terry Gross from there to their car. When she sought medical attention after her release, she was x-rayed and diagnosed as having suffered two fractures of her right tibia at the tibial plateau just below the knee, a lumbar compression fracture in her spine, facial abrasions, and arm and shoulder contusions.

The Grosses initially filed suit against Officer Szopko, Corporal Pellerito, Officer Fraser, and the City of Dearborn Heights in state court, asserting that the defendants' conduct in arresting Mary Gross had violated her federal constitutional rights. The suit was removed to federal court, and the Grosses filed an amended complaint, adding Sergeant Beedle-Peer as a defendant. The defendants moved for summary judgment on all claims, arguing that the officers were entitled to qualified immunity and that, because they did not commit constitutional violations, the Grosses' municipal liability and derivative claims could not survive. The district court granted the motion, ruling that the defendants had entered the plaintiff's residence only after knocking and announcing their purpose; that Mary Gross had resisted arrest prior to being handcuffed and that use of force to arrest her was therefore justified; that the Grosses provided no factual basis for their claim that the officers' use of force on Mary Gross was retaliatory; and that Mary Gross's injury was not obvious because it was discovered only after an x-ray. This appeal followed.

## DISCUSSION

Our review of a district court's grant of summary judgment is conducted *de novo*. *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and the disclosure materials on file, and any affidavits, 'show that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). "There is no genuine issue for trial [if] the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Of primary significance in this case is that, in ruling on the motion, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). Nevertheless, "the mere existence of a scintilla of evidence in support of the non-moving party is insufficient to defeat a motion for summary judgment." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Despite our lengthy discussion of the facts in this case, the resolution of the principal issues on appeal requires little in the way of legal analysis. As the background summary set out above demonstrates, the record is replete with genuine disputes of material fact that rule out summary judgment and necessitate submission of those issues to a trier of fact. Despite the standard that requires a district court to construe all evidence and all reasonable inferences from that evidence in the plaintiffs' favor when a "genuine" dispute exists, the district court in this case repeatedly made findings of fact by crediting the officers' versions of what transpired at the time of Mary Gross's arrest. The district court justified its decision to do so based on the Supreme Court's ruling that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

*Gross v. City of Dearborn Heights*, No. 12-15268, 2014 WL 346017, at \*4 (E.D. Mich. Jan 30, 2014) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The "blatantly contradictory record" identified by the district court in this case was the audiotaped recording made at the Grosses' residence and the videotapes made at police headquarters. But the videotapes do little or nothing to refute Mary Gross's account of how she was injured and how serious the injury was, and the audiotape does more to muddle than to clarify what happened at the time of her arrest. In short, we conclude that the entry of summary judgment based on qualified immunity cannot be sustained and that the case must be remanded for further proceedings on the claims against the individual officers.

With respect to the Grosses' knock-and-announce claim for unlawful entry and seizure, there are genuine disputes of material fact about whether the officers' entry was forcible and when the officers announced their purpose. Terry Gross testified that the officers forcibly entered the home and that the officers announced their intent to arrest Mary Gross only after they had grabbed her. Consistent with Terry Gross's testimony, the audio recording of the encounter captured a commotion shortly after Mary Gross refuses to come out of her home but before any officer can be heard mentioning the warrant. Audio Recording 20:53–55. The audio recording also captured the officers joking about "pushing grandpa aside." *Id.* at 20:59:30. This evidence—that the officers first forcibly entered the Grosses' home, and, several seconds later, announced that they had a warrant for Mary Gross's arrest—creates genuine disputes of material fact.

With respect to the Grosses' excessive force claim, there is a genuine dispute of material fact about when Mary Gross was handcuffed. Terry Gross testified that the officers handcuffed Mary Gross before slamming her into her kitchen counter, forcing her head into her dish rack,

and breaking her leg. The district court disregarded Terry Gross's testimony because the court believed his testimony was clearly contradicted by the audio recording and Mary Gross's testimony. But, contrary to the district court's determination, Terry Gross's testimony about the timing of the officers' handcuffing of Mary Gross can be reconciled with the audio recording, and the Grosses provide a plausible explanation for the inconsistencies between Terry Gross's and Mary Gross's testimony. When Terry Gross's testimony is considered, a genuine dispute of material fact exists regarding the timing of Mary Gross's handcuffing.

With respect to the Grosses' claim of deliberate indifference to medical need, there is a genuine dispute of material fact about whether Mary Gross's medical need was obvious and whether the officers were aware of the need or of circumstances clearly indicating the existence of a need. The district court determined that, because Mary Gross's injury was discovered only after an x-ray, her injury was not obvious. But there is a genuine dispute about its obviousness in light of evidence that Mary Gross informed the officers at least three times that her leg was broken: shortly after Szopko and Pellerito struck her knee, Audio Recording at 20:55, while she was being escorted to the patrol car by Szopko, *id.* at 20:56:15, and again while she was being placed in the car, *id.* at 20:57:14. The video recording of Mary Gross's booking also shows her unable to walk or stand without assistance, repeatedly rubbing her knee, and asking Szopko and Fraser not to send her anywhere until she saw a doctor.

There is also a genuine dispute about the officers' awareness of Mary Gross's medical need in light of evidence that she complained of a broken knee at the scene of her arrest, was told by Szopko to "hop" instead of putting weight on her foot, Audio Recording at 20:56:15, limped into the booking area with the assistance of Szopko and Beedle-Peer, rubbed her knee repeatedly, asked Szopko and Michael Fraser to not "send [her] anywhere until [she can] go see a doctor to

get this fixed," needed the assistance of Szopko to stand while taking her booking photos, was placed in a wheelchair by Szopko and Fraser, had her fingerprints taken by Fraser while in a wheelchair, and was wheeled out of the booking area. Video Recording 21:16:38-21:17:01, 21:17:34-21:18:04, 21:19:04-21:20:56, 21:31:13-21:33:05, 21:45:55-21:49:11, 21:53:55-21:54:04.

However, the district court's grant of summary judgment on the Grosses' First Amendment retaliation claim was correct. The Grosses allege that the officers assaulted Mary Gross during the arrest in retaliation for her request for clothing. In a First Amendment retaliation claim, the constitutionally protected activity—here, the request for clothing—must be a motivating factor behind the retaliatory act. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *see also Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007). The Grosses provide nothing to suggest that the officers' use of force was motivated by the request for clothing. Accordingly, grant of summary judgment on this claim was proper.

Because the district court's dismissals of the Grosses' municipal liability claims and Terry Gross's derivative claims for loss of consortium were based on its dismissal of the underlying claims, the district court should reconsider those claims on remand. The district court's additional reason for rejecting Terry Gross's loss of consortium claim—that he had failed to show an injury—was in error. This argument was not properly raised by the defendants because it was not argued until the defendants' reply brief. In reconsidering Terry Gross's loss of consortium on remand, the district court should consider Terry Gross's testimony that, for several months after the incident, he did "all the cooking, washing, cleaning, all the everything," and that he had sought counseling because of "trouble with [his] dreams and flashbacks and everything like that and guilt."

-11-

**CONCLUSION**

For the reasons set out above, we REVERSE the judgment of the district court and

REMAND the case for further proceedings consistent with this opinion.