**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0669n.06

Case No. 15-1968

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 14, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KATHY ANN BOYER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| ROBERT LACY, Chief Medical Officer, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: KEITH, COOK, and STRANCH, Circuit Judges.

**COOK, Circuit Judge.** Having had the benefit of oral argument, and having studied the record on appeal and the briefs of the parties, we are not persuaded that the district court erred in granting summary judgment to Appellee Lacy. Because the reasons why judgment should be entered for Lacy have been fully articulated by the district court, the issuance of a detailed opinion by this court would be duplicative and would serve no useful purpose. Accordingly, we AFFIRM the judgment of the district court in Lacy's favor upon the reasoning set out by that court in its opinion and order filed on July 15, 2015.

**STRANCH, Circuit Judge, dissenting.** In this 42 U.S.C. § 1983 action, Kathy Boyer, a former state prisoner at the Women's Huron Valley Correctional Facility, alleges that Dr. Robert Lacy, Huron Valley's Senior Site Physician, was deliberately indifferent to her serious medical needs. Ms. Boyer argues that Dr. Lacy exhibited deliberate indifference by failing to render adequate medical care—specifically, by: (1) not referring her to an orthopedic specialist within five days of her emergency room discharge but instead waiting six weeks to do so; (2) not refilling in a timely manner her prescriptions for pain relief drugs; and (3) not placing her in the prison infirmary for care. In addition, James Boyer, Ms. Boyer's husband, makes a claim for loss of consortium. The majority affirms the district court's grant of summary judgment to Dr. Lacy on both counts. Viewing the medical evidence in the light most favorable to Ms. Boyer, as we must, I would hold that a reasonable juror could find in Ms. Boyer's favor on some of her claims. Therefore, I respectfully dissent.

## I. BACKGROUND

Ms. Boyer began her incarceration at Huron Valley on July 26, 2011.[1] Medical records from her primary care physician and her intake physical indicate that, due to a prior motor vehicle accident, she suffered from reduced strength, limited range of motion, osteoarthrosis, and pain in her right shoulder.

On March 14, 2012, Ms. Boyer fell from the top bunk of her cell on to her right shoulder. The nurse who examined Ms. Boyer observed that her right shoulder was "obviously dislocated" and telephoned the on-call physician for that day, Dr. Lacy, who directed her to send Ms. Boyer to the emergency room at St. Joseph Mercy Hospital. There, doctors took x-rays of Ms. Boyer's arm and concluded that she had sustained a "closed right proximal humerus fracture." Ms.

---

[1]Though the district court laid out the background of this case in detail, I provide a summary of relevant facts from the record to provide context for the analysis I would follow.

Boyer testifies that the doctors said her arm was fractured in four places and her "shoulder was dislocated and they could not set it because the bone was displaced. It would have to be set surgically." Ms. Boyer's discharge instructions, prepared by a certified physician assistant, suggested she see an orthopedic surgeon within five days, pursuant to St. Joseph's standard procedure for her type of injury, and, at Ms. Boyer's request, that she be admitted to the prison's infirmary. The instructions also recommended prescriptions for pain medication and a sling for immobilization.

On Ms. Boyer's return to the prison that same night, Dr. Lacy was again contacted by a nurse. He instructed the nurse to give Ms. Boyer temporary pain medication and an abdominal binder to be used with the sling for better immobilization. As an alternative to admitting Ms. Boyer to the prison infirmary, Dr. Lacy provided her "bottom-bunk" and "lay-in" detail, which allowed rest and receipt of meals in her cell, in addition to a wheelchair for better access to medication lines. The nurse, at Dr. Lacy's request, scheduled a follow-up and chart review in the morning, with instructions for the follow-up doctor to "call in prescription medication" and extend the bottom-bunk, lay-in, and wheelchair details. Over the next two days, the physician assigned to follow-ups, Dr. Vivian Johnson, prescribed Vicodin and other pain medications, extended the details, and added a detail allowing her to forgo tucking in her shirt—but like Dr. Lacy neither requested an orthopedic consult nor admitted her to the infirmary.

On March 23, nine days after her fall, Ms. Boyer again visited the health clinic, complaining of severe bruising and pain, and a nurse described her arm as in "various stages of bruising," her hand as swollen, and her chest as bruised. Dr. Lacy directed the nurse examining Ms. Boyer to refer her to a physician for further evaluation. Medical records do not indicate how the nurse communicated with Dr. Lacy, who testified he could not recall. Ms. Boyer asserts that

Dr. Lacy was physically present at this appointment and, in response to her request for a renewed Vicodin prescription, told her "to order Motrin from the commissary. I'm not renewing the Vicodin."

On March 29 and April 2, Ms. Boyer filed kites stating that she was out of pain medication and requesting an appointment with Dr. Johnson or Dr. Lacy. A prison official responded to the kites by telling Ms. Boyer that she would have to wait until her scheduled appointment "around" April 4. As the district court explained, despite the two kites asserting lack of pain medication, medical records show that from March 16 to April 5 Ms. Boyer took one to two tablets of Vicodin per day and had access to ibuprofen.

On April 3, Ms. Boyer attended her scheduled appointment with a nurse, who received verbal instructions from Dr. Lacy to order Advil with a start and stop date of April 3 and April 6 respectively. Dr. Lacy also authorized another prisoner to serve as Ms. Boyer's personal care aide, but prison policy prevented the inmate from assisting with feeding, clothing, or personal hygiene.

That same day, the Assistant Resident Unit Supervisor of the jail requested that Ms. Boyer be transferred to the infirmary. Although Ms. Boyer admits that at this time Dr. Lacy had not completed a physical exam of her, she testified that he saw that her arm was black from her fingers all the way across the middle of her chest, "not black and blue, black." According to Ms. Boyer, Dr. Lacy told her "that's normal bruising from a broken arm" and, responding to a physician assistant asking if Ms. Boyer had "a ruptured biceps," said that it was just bleeding internally. Dr. Lacy denied seeing Ms. Boyer bruised "[b]lack from the shoulder to the fingertips," but admits if he had it would have been cause for "quite a bit of alarm." A fellow prisoner and former registered nurse testified that she "could barely get a radial pulse on [Ms.

Boyer's] wrist" and observed extensive bruising and swelling of Ms. Boyer's arm, shoulder, and chest; she thought at the time that Ms. Boyer "probably had a fractured humerus and it was overriding the upper part of the humerus." Evidence also exists that, although a nurse visited her every day, Ms. Boyer relied on fellow prisoners for care during this time. Dr. Lacy ultimately denied the Unit Supervisor's request to transfer Ms. Boyer to the infirmary, claiming that her needs could be managed in the housing unit.

On April 10, Dr. Lacy for the first time ordered follow-up x-rays, after which he requested an orthopedic evaluation. There is evidence in the record that Ms. Boyer's fracture was "minimally displaced" at the time of the injury but became "completely displaced" by April. As an explanation for Ms. Boyer's worsened condition, Dr. Lacy claims he ordered the x-rays due to his concern that if she failed to wear her sling as instructed, the fracture could become displaced.

On April 25, six weeks after the injury, Ms. Boyer attended an initial orthopedic visit with orthopod Dr. Khawaja H. Ikram. Dr. Ikram, noting that x-rays "demonstrate an early malunion of a right proximal humerus fracture with areas that are still not completely filled in," recommended Ms. Boyer see a shoulder specialist and surgeon to undergo expedited open reduction surgery with fixation of the fracture. Later that day, Dr. Lacy reordered Ms. Boyer's pain medication, admitted her to the infirmary to monitor her compliance with wearing the sling, and scheduled Ms. Boyer to see orthopedic shoulder specialist and surgeon Dr. John Walper. According to Ms. Boyer, Dr. Lacy asked "how long [her] arm had been black," remarked "It's terrible," and said "it was probably bleeding internally that entire time." He then apologized for not taking her injury seriously when he saw her previously.

5

The district court summarized Ms. Boyer's pain medication intake in April as follows:

(1) from April 1-5, 2012, plaintiff took one tablet per day of Vicodin; (2) from April 6-24, 2012, plaintiff did not receive any Vicodin, Toradol, or Norco; (3) on April 25, 2012, plaintiff received a 60mg shot of Toradol; and (4) from April 26-30, 2012, plaintiff took two to four tablets per day of Vicodin.

Dr. Lacy concedes that Ms. Boyer was not provided pain medication from April 6 to April 24. Ms. Boyer testified that she filed "over 20 kites" asserting she was in pain or lacking pain medication during that 19-day period, but these kites are not documented in her medical record. On May 1, Dr. Lacy reordered Ms. Boyer's Norco with a start date and end date of May 1 and June 2 respectively.

On May 2, Ms. Boyer saw Dr. Walper, who, based on x-rays taken that day, recommended continued conservative treatment and reassessment in four to six weeks. Dr. Walper saw Ms. Boyer for a second time on June 13, when he noted that "her healing was fairly complete." He stated that Ms. Boyer should have a "fairly functional shoulder."

Throughout May and until June 6, Ms. Boyer received pain medication. Ms. Boyer was discharged from the infirmary to the housing unit on June 18, at which time her pain was minimal and range of motion was 180 degrees for abduction. She was released on parole on July 24, 2012. On April 14, 2014, the Boyers filed the present action.

## II.  STANDARD OF REVIEW

We review grants of summary judgment de novo. *See V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Summary judgment is appropriate only when the evidence, taken in the light most favorable to and with all reasonable inferences drawn in favor of the nonmoving party, establishes that there is no genuine issue as to any material fact, such that any reasonable juror must conclude that the movant is entitled to judgment as a matter of

law. *Id.* (citing Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Id.* at 255.

### III. ANALYSIS

#### A. Deliberate Indifference

Section 1983 provides a cause of action for violations of constitutional rights by persons acting under color of state law. 42 U.S.C. § 1983. "A prison doctor violates the Eighth Amendment when [he] exhibits 'deliberate indifference to [the] serious medical needs' of a prisoner." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (second alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Because the parties do not dispute that Ms. Boyer suffered from "serious medical needs," the objective component of an Eighth Amendment claim, Ms. Boyer need only establish the subjective component—that Dr. Lacy "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (6th Cir. 2001)).

The subjective component requires "more than negligence or malpractice," *Estelle*, 429 U.S. at 110, but a "plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result,'" *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013) (quoting *Comstock*, 273 F.3d at 703). "[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that

risk," and it may be proven through "inference from circumstantial evidence" or "from the very fact that the risk was obvious." *Id.* at 681–82 (alteration in original) (citing *Farmer*, 511 U.S. at 836, 842). Where, as here, "a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments.'" *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). But medical treatment may be "so woefully inadequate as to amount to no treatment at all." *Id.* And "our cases do not support the notion that a prison doctor who delays treatment may escape liability simply because the treatment was recommended rather than prescribed. '[I]nterruption of a prescribed plan of treatment could constitute a constitutional violation . . . ." *Santiago*, 734 F.3d at 590 (citations omitted).

Ms. Boyer claims that Dr. Lacy exhibited deliberate indifference in several respects. I address each claim individually but also consider them together, under the totality of the circumstances, to determine whether a reasonable juror could find deliberate indifference on the part of Dr. Lacy. *See Westlake*, 537 F.2d at 860 n.4 ("Whether a prisoner has suffered unduly by the failure to provide medical treatment is to be determined in view of the totality of the circumstances."); *see also Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 552 (6th Cir. 2009) (concluding that "a reasonable jury could determine that the totality of the circumstances demonstrates deliberate indifference").

1. Failure to Refer Ms. Boyer to Orthopedic Specialist

Ms. Boyer first argues that Dr. Lacy exhibited deliberate indifference by failing to refer her to an orthopedic specialist within five days of her injury, as recommended by her emergency room discharge instructions. On Ms. Boyer's return to Huron Valley, Dr. Lacy, by telephone, instead gave short-term orders consistent with a conservative, non-surgical treatment plan (*i.e.*,

rest and immobilization). He directed a nurse to schedule a morning follow-up and chart review with the physician assigned to handle such matters that day—Dr. Johnson. Dr. Johnson treated Ms. Boyer over the next two days but did not order an orthopedic consult. On several occasions during the weeks that followed, Dr. Lacy directed and continued Ms. Boyer's conservative medical treatment; not until April 25, six weeks after her injury, did Ms. Boyer see an orthopedic specialist.

Dr. Lacy responds that "direct responsibility" for treating Ms. Boyer's injury resided with Dr. Johnson, who received the discharge instructions and determined whether to follow them, and that Dr. Lacy could not have inferred a substantial risk to Ms. Boyer because he reasonably relied on Dr. Johnson to provide adequate treatment. Section 1983 liability "must be based on more than respondeat superior, or the right to control employees." *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citation omitted). A supervisor must have "encouraged" or "directly participated" in the unconstitutional conduct, or "at least implicitly authorized, approved, or knowingly acquiesced" in it. *Id.*

I agree that Dr. Lacy's supervisory position as Senior Site Physician does not make him responsible for Dr. Johnson's decision not to order a consultation. Ms. Boyer maintains, however, that Dr. Lacy directly participated in the decision not to order an orthopedic consultation because he was the initial physician who advised on her injuries and "the head of the unit," and had the responsibility to schedule an appointment but did not. Although Dr. Lacy testified that he expected the follow-up physician to assess the necessity of the discharge instructions, this argument is undercut by Dr. Lacy's instruction to Dr. Johnson to "call in prescription medication" and extend the other short-term orders he gave on the night of Ms. Boyer's injury. Dr. Lacy could have instructed Dr. Johnson to schedule an orthopedic

consultation as well. Indeed, after personally directing Ms. Boyer's medical treatment on multiple occasions—at least as often as Dr. Johnson—he finally scheduled the consultation himself six weeks after the injury. Ms. Boyer also testified that, following the consultation, Dr. Lacy apologized for not taking her injury seriously, perhaps evidencing some responsibility to chart a different course. In light of Dr. Lacy's awareness that the provision of medical care at the prison is shared, his level of participation in overseeing Ms. Boyer's care matters.

The district court nonetheless found that, because Dr. Lacy did not have actual knowledge of the discharge instructions, he was not "aware of facts from which the inference could be drawn that a substantial risk of harm exists." The record does not firmly establish whether or not Dr. Lacy knew of the discharge instructions. (*Compare* R. 45-2, Dep. of Dr. Lacy, PageID 1027 (explaining nurse would give on-call doctor some information following emergency room visit), *with id.* at 1032 ("I don't have any memory of knowing [the discharge instruction to follow up with an orthopedic surgeon] at the time. . . . [T]hese records would have gone to Dr. Johnson.").) Regardless, the district court did not address Ms. Boyer's argument that Dr. Lacy's admitted knowledge of the injury alone was enough to infer a substantial risk. Taking the evidence in the light most favorable to Ms. Boyer, a reasonable juror could conclude from Dr. Lacy's level of participation and knowledge of Ms. Boyer's injury that he inferred a substantial risk. *See Quigley*, 707 F.3d at 682 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" or other circumstantial evidence.); *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 578 (6th Cir. 2013) (same).

Next Dr. Lacy argues that, even if he did infer a substantial risk, the conservative, non-surgical medical care Ms. Boyer received without orthopedic consultation was reasonable and

not "so woefully inadequate as to amount to no treatment at all." *See Westlake*, 537 F.2d at 860 n.5. Dr. Lacy testified that "the most common way to treat that type of a fracture would be with a sling and a swath," and "a primary care physician can take care of these types of fractures on their own" without an orthopedic consult. (R. 45-2, Dep. of Dr. Lacy, PageID 1032.) In support, Dr. Lacy relies on three other medical opinions in the record: (1) Dr. Johnson did not order an orthopedic consultation; (2) Dr. Walper submitted an affidavit on January 15, 2015 stating,

> If I had seen Ms. Boyer within 5 days of her injury and her x-rays on the date of that visit were like those from March 14, 2012, I would not have recommended surgery. I would have continued her non-operative treatment with immobilization, and I would have followed the patient closely with repeat x-rays within two weeks to reassess for any change in angulation or displacement.

(R. 45-6, Aff. of Dr. Walper, PageID 1175); and (3) Dr. Paul Drouillard concluded in his expert report that,

> Ms. Boyer did not require surgery for her March 14, 2012, injury. Had she been a patient in my office, I would have treated her nonoperatively. Immobilization was the appropriate and proper treatment and a sling-and-swathe is an appropriate means of immobilization. . . . I would expect this fracture to heal with immobilization, which it did. Ms. Boyer's fracture did not become more displaced between the time of her injury and the time of Ms. Boyer's orthopedic evaluations (April to June 2012). Additionally, Ms. Boyer was not a surgical candidate due to her history of MRSA infections.

(R. 45-11, Expert Report of Dr. Drouillard, PageID 1222.)

Ms. Boyer responds to Dr. Lacy's evidence with four medical opinions in the record in support of her position that not scheduling an orthopedic consultation, and perhaps even the choice to follow a conservative treatment plan itself, was "woefully inadequate." Namely, (1) St Joseph recommends scheduling a consultation for all such injuries as standard procedure; (2) Dr. Ikram concluded that orthopedic surgery was required; (3) Dr. Walper made notes in Ms. Boyer's medical file at the time of the May 2, 2012 consultation that,

> had I seen [Ms. Boyer] acutely in the first week or two after the fracture, I might have considered surgical fixation for it. Now that it has been six or seven weeks, there is abundant callus formation and attempted healing and there appears to be good apposition in the coronal plane and acceptable apposition in the sagittal plane.

(R. 50, MDOC Medical R., PageID 1414); and (4) Dr. James Frew, Ms. Boyer's primary care physician, testified that Ms. Boyer's injury required her "to be referred to an orthopedic surgeon within five days" because surgical intervention for this type of injury should be done within a week, and the lack of surgical intervention worsened her injury resulting in a "frozen shoulder" (R. 49-8, Dep. of Dr. Frew, PageID 1363, 1365).

The district court noted Ms. Boyer's medical evidence but concluded that she merely "preferred surgery over the noninvasive treatment she received" and that her proof shows only a disagreement among physicians on whether an orthopedic consult was indicated. But disagreement among certain experts on whether a course of treatment is "woefully inadequate" does not necessarily prevent a reasonable juror from agreeing with the side who deems the treatment unconstitutional. *See Quigley*, 707 F.3d at 682 (concluding that "a reasonable juror could infer that [the defendant] knew based on the fact that most professionals would know, even if all did not."); *see also Villegas*, 709 F.3d at 578 (concluding that jury could determine, based in part on "conflicting expert testimony about the ill effects of Plaintiff's shackling," that "Defendant had knowledge of the substantial risk, recognized the serious harm that such a risk could cause, and, nonetheless, disregarded it").

Dr. Lacy questions the persuasiveness of the medical opinion submitted by Ms. Boyer. He dismisses Dr. Walper's original opinion that he may have recommended surgery had he seen Ms. Boyer earlier because it was given without review of the March 14 x-rays, which showed Ms. Boyer's medical condition immediately following her injury. After reviewing the March 14

x-rays, Dr. Walper opined that he would not have recommended surgery. Even so, Dr. Walper's eventual agreement with a conservative treatment plan for Ms. Boyer does not necessarily establish the adequacy of Dr. Lacy's making that decision without the benefit of an orthopedic consultation. In fact, Dr. Walper's initial uncertainty suggests a need for such injuries to be reviewed by a specialist.

Dr. Lacy also doubts Dr. Frew's qualifications as an expert, noting that he is a primary care physician whose "'orthopedic background' consists of "orthopedic rotations during a general surgery program that he did not finish." Dr. Frew testified, though, that he had general surgery training, half of which was orthopedic, giving him "quite a bit of hands-on experience in orthopedics." The question here, moreover, is whether it is "woefully inadequate" for a primary care physician not to refer the type of injury suffered by Ms. Boyer to an orthopedic specialist—a question that a primary care physician should be well-placed to answer.

Most importantly, Dr. Lacy's attack on Ms. Boyer's medical evidence must fail because, on a motion for summary judgment, weighing and drawing inferences from competing medical-opinion evidence, and determining the credibility of medical experts, are functions reserved for the jury. *See Villegas*, 709 F.3d at 578. Viewing the medical evidence in the light most favorable to Ms. Boyer, I would hold that a reasonable juror could conclude that Dr. Lacy's failure to schedule an orthopedic consultation within five days of Ms. Boyer's injury and instead waiting six weeks to do so was "woefully inadequate."

### 2. Failure to Refill Ms. Boyer's Pain Medication

Ms. Boyer next argues that Dr. Lacy exhibited deliberate indifference by failing to refill her pain medication prescriptions in a timely fashion. On April 3, 2012, when Ms. Boyer's Vicodin prescription was still active, Dr. Lacy directed a nurse to order Advil to last until April

6. Ms. Boyer took one of her remaining Vicodin tablets each night between April 3 and 5, but the prison commissary took three weeks to fill her order of Advil. Medical records show that Ms. Boyer did not receive any pain medication between April 6 and 24—a period of 19 days. On April 25, when Ms. Boyer was admitted to the infirmary following her initial orthopedic visit, Dr. Lacy reordered Ms. Boyer's pain medication.

Despite Ms. Boyer's allegation at her deposition and before the district court that she—or other inmates on her behalf—filed kites regarding her pain and need for medication between April 6 and 24, those grievances are not in the record. On appeal, Ms. Boyer appears to abandon this part of her claim. She instead points to evidence predating April 6—namely, the March 29 and April 2 kites, and the fact that Dr. Lacy prescribed Advil on April 3. From this evidence, Ms. Boyer argues that Dr. Lacy inferred a substantial risk of a degree of pain that required narcotic pain medication but deliberately disregarded that risk on April 3, when he refused to prescribe narcotics and instead knowingly required her to wait three weeks for Advil from the prison commissary.

Dr. Lacy's extensive involvement in Ms. Boyer's treatment again undercuts his claim that he reasonably relied on adequate care being provided by Dr. Johnson, who originally prescribed Ms. Boyer's Vicodin and, Dr. Lacy suggests, typically would have been the medical provider consulted on any medical kites or requests for prescription refills. But Ms. Boyer was not out of narcotics at the time she requested a prescription renewal from Dr. Lacy—as she took one Vicodin tablet on April 3, 4, and 5—and her earlier kites confirmed that she knew how to ask for pain medication when she needed it. There is no evidence in the record confirming Ms. Boyer requested medication in the relevant time period. For this reason, I find Dr. Lacy's argument that he reasonably relied on Ms. Boyer to request pain medication as necessary more persuasive.

14

I would thus conclude that, with regard to Ms. Boyer's failure-to-refill claim standing alone, a reasonable juror could not conclude from the pre-April 6 evidence that Dr. Lacy inferred a substantial risk that she would lack pain medication between April 6 and April 24, or that he disregarded such a risk.

### 3. Failure to Admit Ms. Boyer to the Infirmary

Ms. Boyer lastly argues that Dr. Lacy exhibited deliberate indifference by failing to admit her to the infirmary on her return to Huron Valley on March 14 and refusing the request of the Assistant Resident Unit Supervisor to admit her on April 3. On March 14, Dr. Lacy instead gave short-term orders for pain medication and bottom-bunk, lay-in, and wheelchair detail, with instructions to the follow-up physician to continue those orders. He later explained that he denied the Unit Supervisor's request because "[t]here wasn't anything in the infirmary that they should have been able to provide that she couldn't have had out in general population" and this type of injury "can be taken care of in general population. If someone breaks their arm out in the community, you don't send them to a nursing home for the whole 6 weeks or 8 weeks or 12 weeks that it takes to heal." (R. 49-4, Dep. of Dr. Lacy, PageID 1317.) On April 25, after Dr. Ikram recommended Ms. Boyer see a shoulder specialist and undergo surgery, Dr. Lacy admitted Ms. Boyer to the infirmary, as he explains, to monitor her compliance with the sling.

Ms. Boyer cites the recommendation to admit her to the infirmary in her discharge instructions as evidence that Dr. Lacy's failure to do so was "woefully inadequate." The record clarifies, however, that the certified physician assistant who prepared the discharge instructions included that recommendation only at Ms. Boyer's request. The physician assistant submitted an affidavit affirming that she is "not familiar with how the infirmary cells at [Huron Valley] differ from having a 'lay in' order in a general population cell at that facility," and she "believe[s] that

15

a 'lay in' order is a reasonable alternative to being in the infirmary to the extent that it allows the patient to rest in her cell and have meals delivered to her." Thus, as for Ms. Boyer's failure-to-admit claim standing alone, without a medical opinion in the record suggesting that Ms. Boyer needed to be in the infirmary to receive adequate medical care, a reasonable juror could not conclude that Dr. Lacy inferred a substantial risk or deliberately disregarded it by ordering bottom-bunk, lay-in, and wheelchair detail instead.

### 4. Totality of the Circumstances

The 19-day period in which Ms. Boyer received no pain medication and the weeks she spent outside the infirmary, however, remain relevant to Ms. Boyer's claim. The physician assistant's affidavit fails to address Ms. Boyer's argument that being in the infirmary would have allowed closer monitoring of her medical condition, perhaps leading to an earlier orthopedic consultation. Under the totality of the circumstances, a reasonable juror could consider this evidence together as indicative of Dr. Lacy's knowing abandonment and isolation of Ms. Boyer, which may substantiate that he deliberately disregarded a substantial risk to her.

### B.      Loss of Consortium

Mr. Boyer alleges a loss-of-consortium claim predicated on his wife's claim of deliberate indifference. The district court dismissed Mr. Boyer's claim because, under Michigan law, a loss-of-consortium claim is derivative of and "stands or falls" with the underlying claim. *See Moss v. Pacquing*, 455 N.W.2d 339, 583 (Mich. Ct. App. 1990) (citing *Furby v. Raymark Indus., Inc.*, 397 N.W.2d 303 (1986)). Because I conclude that Ms. Boyer's deliberate-indifference claim survives, as explained above, so may Mr. Boyer's claim for loss of consortium.

The district court, citing *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), also dismissed Mr. Boyer's loss of consortium claim, finding it not cognizable in a § 1983 claim. In

16

*Claybrook*, the Sixth Circuit held that, because "a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort . . . [,] no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Claybrook*, 199 F.3d at 357 (citations omitted). However, while *Claybrook* forecloses an independent *federal* claim for loss of consortium *under* § 1983, precedent shows that a *state-law* claim for loss of consortium may be brought *alongside* a substantive § 1983 claim, pursuant to the pendent jurisdiction provided by 28 U.S.C. § 1367. *See, e.g.*, *Gross v. City of Dearborn Heights*, 625 F. App'x 747, 754 (6th Cir. 2015) (remanding husband's derivative loss-of-consortium claim because wife's § 1983 excessive force claim survived); *Kinzer v. Metro. Gov't of Nashville*, 451 F. Supp. 2d 931, 934, 941–42 (M.D. Tenn. 2006) (analyzing circuit precedent, including *Claybrook*, to conclude that wife's derivative claim for loss of consortium could proceed because it did not arise under § 1983 but arose alongside her husband's § 1983 action). Mr. Boyer's loss-of-consortium claim thus is cognizable.

Dr. Lacy's final argument is that Mr. Boyer cannot demonstrate actual damages because, before incarceration, Ms. Boyer suffered from the same physical impairments of which she now complains. Medical records do indicate a preexisting physical impairment in Ms. Boyer's right shoulder that limited her participation in certain domestic and recreational physical activities, but both Mr. and Ms. Boyer testified to specific ways in which the 2012 injury further diminished Ms. Boyer's physical abilities. That Ms. Boyer suffered from physical impairments before incarceration does not foreclose a reasonable juror from concluding that Dr. Lacy's deliberate indifference impaired her further.

## IV.    CONCLUSION

Under the proper standard of review, I conclude that summary judgment should not have been granted and Ms. Boyer's claims should have been resolved by the trier of fact.  Therefore, I respectfully dissent.