*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0056p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————

LUIS DOMINGUEZ,

　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

　　　　　　　　　　　　　　　　　No. 08-1212

CORRECTIONAL MEDICAL SERVICES, et al.,

　　　　　　　　　　　*Defendants,*

JULIE FLETCHER,

　　　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-72015—George C. Steeh, District Judge.

Argued: December 5, 2008

Decided and Filed: February 17, 2009

Before: MERRITT, MOORE, and COLE, Circuit Judges.

————————

**COUNSEL**

**ARGUED:** John L. Thurber, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee. **ON BRIEF:** John L. Thurber, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Shawn C. Cabot, Christopher J. Trainor, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee.

————————

**OPINION**

————————

COLE, Circuit Judge. Plaintiff-Appellee Luis Dominguez filed his claims under 42 U.S.C. § 1983 alleging that on July 7, 2002, while housed at a Michigan Department of Corrections ("MDOC") facility, he was subjected to excessive force and inadequate medical care in violation of the Eighth Amendment, as well as gross negligence under Michigan state

1

law.  The issue before this Court is whether the district court properly denied Defendant-Appellant Julie Fletcher's motion for summary judgment.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual Background

This case arises from medical treatment Dominguez received while an inmate at the Carson City Correctional Facility, located in Carson City, Michigan.  On July 7, 2002, Dominguez and other inmates attended an outdoor weight-training session.  It was a hot day with temperatures reaching at least ninety degrees.  Toward the end of the one-and-one-half hour session, Dominguez complained to a fellow inmate, Pablo Rodriguez, that he felt dizzy and needed to catch his breath.  Rodriguez tried to help steady Dominguez.  Nonetheless, Dominguez fell to the floor, complaining that he could not breathe.  Rodriguez brought water from a nearby faucet and poured it over Dominguez's head to try to cool him down.  After about twenty minutes, Dominguez started to feel better and was able to walk back to his housing unit.

Arriving back at the housing unit, Dominguez proceeded to a guard office where corrections officer Crystal Galvan-Casas was working.  Dominguez informed Galvan-Casas that he had just come from his weight-training session and did not feel well.  She told him to take a shower and cool off.  Dominguez then went to the bathroom to shower but returned a short time later.  Galvan-Casas did not know whether Dominguez had actually been able to take a shower.  Dominguez stated he was afraid he would fall down and Galvan-Casas noticed he was "wobbly."  Based on her concern arising from Dominguez's condition, at around 3:30 p.m., Galvan-Casas telephoned nurse Julie Fletcher.

During the call, Fletcher took notes of her conversation with Galvan-Casas.  (*See* Progress Notes, Joint Appendix ("JA") 75.)  The notes indicate that Galvan-Casas told Fletcher that Dominguez appeared to be suffering from heat exhaustion.  (*See id*.)  Fletcher did not provide Galvan-Casas with any instructions for how to care for Dominguez, but she said she would check on Dominguez when she passed out medication at around 7:00 p.m.

Galvan-Casas then handed the phone to Dominguez, and Fletcher instructed him to drink fluids, lie down, and rest. Dominguez then returned to his "cube" in the housing unit.

During her rounds, at about 4:00 p.m., Galvan-Casas checked in on Dominguez to ask him how he was doing. He told her that his head hurt. Dominguez's cube-mate stated that he believed that Dominguez was getting worse. Galvan-Casas again called Fletcher, informing her that Dominguez's condition had deteriorated and that he was throwing up all the water he was drinking. Fletcher then agreed to see Dominguez in the medical unit. Galvan-Casas sent for a wheelchair and had Dominguez wheeled over to the medical unit. Another guard, Craig Humphreys, who accompanied Dominguez to the medical unit, observed him sweating profusely and noticed vomit on his clothing.

After arriving at the medical unit, Dominguez met with Fletcher and told her he had become light-headed and dizzy while exercising outside. Dominguez explained that he was experiencing numbness in his left arm and had difficulty catching his breath. Fletcher checked his blood pressure, pulse, temperature, and oxygen saturation, listened to his heart, and checked his grip strength. Dominguez alleges, and Fletcher's notes do not refute the assertion, that she did not attempt to measure Dominguez's core temperature. At some point during the examination, Dominguez vomited again—this time a clear substance. Fletcher claims she contacted Physician's Assistant Mark Boomershine of MDOC's Duane Waters Hospital in Jackson, Michigan. Boomershine and Fletcher allegedly discussed Dominguez's condition. Fletcher then advised Dominguez to return to his housing unit to rest, drink water, avoid sports and weight-lifting, and take aspirin. According to Fletcher, Dominguez walked out of the medical unit without assistance. Fletcher also completed a Suspected Heat Related Illness Report Form.

Dominguez then returned to his cube. The parties dispute whether Fletcher knew or should have known that Dominguez's cube was excessively hot. However, there is no indication in the record that Fletcher inquired into the ambient temperature of the housing units. Moreover, there is no evidence that Fletcher ordered that Dominguez be placed in one of the two air-conditioned holding cells in the medical unit, both of which were empty at the time.

At around 6:30 p.m., Galvan-Casas again went to Dominguez's cube to check on his condition. She found him unconscious on the floor and was unable to wake him. Another guard arrived and continued attempts to revive Dominguez while Galvan-Casas went to call for medical assistance. Galvan-Casas states that she called "health care" and the "control center" to inform them that Dominguez had lost consciousness and needed medical attention. (Deposition of Galvan-Casas 64, JA 181.) Fletcher's notes indicate that she received a call from an officer in Dominguez's housing unit at about 6:35 p.m. Fletcher's notes do not state whether she had been informed that Dominguez had been unconscious; however, she concedes this fact on appeal. Her notes do indicate that she was told that Dominguez had been lying down since his earlier visit to the medical unit, was now complaining of dizziness, and had been unable to consume any water.

Fletcher instructed the guard to give Dominguez water. However, Fletcher's notes state that she received a second call at 6:40 p.m. informing her that Dominguez, who apparently had been revived, vomited when he tried to drink water. Based on the news from this second call, Fletcher told the guard that she would see Dominguez at the medical unit.

Another inmate brought Dominguez by wheelchair to see Fletcher at 6:55 p.m. Fletcher's notes indicate that she was informed that Dominguez could not hold down water, felt dizzy, and his entire side felt "prickly." (Progress Notes, JA 76) Fletcher took Dominguez's vital signs and contacted Dr. Robert Dorr, D.O., an osteopathic physician who was on duty at Duane Waters Hospital, at about 7:10 p.m. Fletcher and Dorr discussed Dominguez's condition, and agreed that Dominguez appeared to be suffering from dehydration. Dorr instructed Fletcher to monitor Dominguez in an air-conditioned room, to encourage him to drink water, and to apply ice to his armpits and groin. Dominguez was given water, and ice bags were applied to his body. Fletcher then left Dominguez with an officer while she resumed her duty of passing out medication.

Around 7:25 p.m., Dominguez's condition rapidly worsened. Dominguez's speech became slurred, he slumped in his wheelchair, and he began shaking uncontrollably.[1]

---

[1] In the district court, Dominguez had alleged that at some point before MDOC officials transferred him to the hospital, officers had unnecessarily thrown him on the floor and performed an illegal drug search. However, Dominguez does not reargue those points before this Court. And whether any search took place is irrelevant to this appeal.

Shortly thereafter, Dominguez became completely non-responsive. The record is unclear as to whether Fletcher came back to check on Dominguez or whether the guard watching Dominguez called for her; however, on her return, Fletcher attempted to insert an oral airway, but was unable to do so because Dominguez's mouth was clenched shut.

At some point, emergency medical services ("EMS") was contacted. EMS arrived on the scene at about 7:41 p.m. and assumed Dominguez's medical care. EMS then transferred Dominguez to Carson City Hospital. Fletcher had no further role in Dominguez's care.

At Carson City Hospital, doctors were unable to diagnose Dominguez's condition. He was transported by helicopter for treatment at Foote Hospital in Jackson, Michigan.

As a result of the events on July 7, 2002, Dominguez remains in a "'locked-in state' as a quadriplegic with limited communication but complete consciousness." (Final Br. of Plaintiff-Appellee Dominguez 4.) The Parole Board released Dominguez on medical parole in 2002. He was ultimately discharged in 2004.

**B.    Procedural Background**

Dominguez sued eleven MDOC employees, Correctional Medical Services ("CMS"), and two of CMS's employees claiming that they violated his Eighth Amendment rights. Fletcher moved for summary judgment based, in part, on qualified immunity. On September 25, 2007, the magistrate judge issued a Report and Recommendation recommending that Fletcher's summary judgment motion be denied.

On February 14, 2008, the district court accepted in part and rejected in part the Report and Recommendation. (Opinion and Order of Feb. 14, 2008 ("Dist. Ct. Op."), JA 530-53.) In its opinion, the court denied Fletcher's motion for summary judgment as to qualified immunity on Dominguez's deliberate indifference claim and also determined that Dominguez's claim for gross negligence under Michigan law should proceed to trial. Fletcher's timely notice of appeal followed.

## II.  JURISDICTION

We first consider whether this Court has jurisdiction.  "Title 28 U.S.C. § 1291 limits appellate jurisdiction to 'final decisions of the district courts.'"  *Estate of Kirby v. Duva*, 530 F.3d 475, 480 (6th Cir. 2008).  As a general matter, a district court's grant of summary judgment on a qualified-immunity claim constitutes a final appealable decision under 28 U.S.C. § 1291.  *See, e.g.*, *Dunigan v. Noble*, 390 F.3d 486, 488 (6th Cir. 2004).  A district court's denial of summary judgment on qualified immunity, however, is a final decision under § 1291 only "to the extent that it turns on an issue of law."  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  Mixed issues of law and fact are treated as issues of law.  *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc) (citing *Whitney v. Brown*, 882 F.2d 1068, 1071 (6th Cir. 1989)).  "[F]or appellate jurisdiction to lie over an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede the facts as alleged by the plaintiff and discuss only the legal issues raised by the case."  *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002) (citations omitted).  Fletcher concedes the disputed facts and limits her arguments to the legal issues arising from those facts.  This Court, therefore, has jurisdiction to consider this appeal.

## III.  ANALYSIS

### A.     Standard Of Review

When no facts are in dispute, whether an official receives qualified immunity is a question of law.  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)).  This Court reviews the district court's denial of summary judgment de novo.  *Williams*, 186 F.3d at 689.  Summary judgment is warranted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, we view the factual evidence and draw all reasonable inferences in favor of the non-moving party.  *Williams*,

186 F.3d at 689. A "mere scintilla of evidence is insufficient; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)).

**B.        Qualified Immunity**

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id*. at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)); *cf. Pearson v. Callahan*, No. 07-751, 2009 U.S. LEXIS 591, (Jan. 21, 2009) (holding that the two-part test is not longer considered mandatory; thereby freeing district courts from rigidly, and potentially wastefully, applying the two-part test in cases that could more efficiently be resolved by a modified application of that framework).

*1.        Constitutional Violation*

For the failure to provide medical treatment to constitute a constitutional violation, Dominguez must show that the defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]hat a [medical professional] has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id*. at 106. For a claim

to be cognizable, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* It is only this indifference that offends the "'evolving standards of decency' . . . of the Eighth Amendment." *Id.* A constitutional claim for deliberate indifference contains both an objective and a subjective component. The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective component, in contrast, requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

The parties agree that Dominguez demonstrated a sufficiently serious medical need and therefore focus on the subjective component. Thus, the central question on appeal is whether Fletcher subjectively perceived a substantial risk to Dominguez, which she then disregarded. This subjective standard "is meant to prevent the constitutionalization of medical malpractice claims," *Comstock*, 273 F.3d at 703 (citations omitted); however, "a plaintiff need not show that the officer acted with the specific intent to harm." *Phillips*, 534 F.3d at 540. This Court has previously determined that "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* (citing *Comstock*, 273 F.3d at 703). Because government officials do not readily admit the subjective component of this test, it may be "demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (citing *Farmer*, 511 U.S. at 842); *see also Phillips*, 534 F.3d at 540 (citing *Comstock*, 273 F.3d at 703).

Viewing the facts in the light most favorable to Dominguez, we conclude that the district court was correct to determine that the facts show that Fletcher was aware of risks associated with excessive heat, dehydration, and heat stroke. It is not necessary

that Fletcher was specifically aware that Dominguez could become a quadriplegic as a result of his condition, but rather, that Fletcher knew that serious risks accompany heat-related illnesses and dehydration. As a trained medical professional, a registered nurse, Fletcher was aware or should have been aware of such dangers.

Nonetheless, Fletcher ignored and/or acted with deliberate indifference when faced with those risks. First, she was aware, or should have been aware, of the outdoor temperature on July 7, 2002 and that housing units were not air-conditioned.

Later, at about 3:30 p.m., Fletcher received a call from Galvan-Casas describing Dominguez's condition. While there was nothing inappropriate about Fletcher's initial treatment instructions, Fletcher's care demonstrates deliberate indifference when she informed Dominguez that despite his serious symptoms she would not see him until her regularly scheduled medication run at around 7:00 p.m. *See Terrance*, 286 F.3d at 844 ("[A] prison employee's two-hour delay in providing medical care to an inmate known to have a serious condition may constitute deliberate indifference.") (citing *Cooper v. Dyke*, 814 F.2d 941, 945-46 (4th Cir. 1987)).

Eventually, Fletcher agreed to see Dominguez after his condition worsened, and Fletcher was informed that Dominguez was "suffering from heat exhaustion." (Progress Notes, JA 75.) At this point, Dominguez had vomit on his clothes, and he vomited again during his examination. While the parties dispute whether Fletcher should have taken his core temperature reading, it is not clear that her failure to do so amounts to a constitutional violation. Rather, the more troubling aspect of Fletcher's care is her decision to allow Dominguez to return to his non-air-conditioned cube despite the apparent severity of Dominguez's symptoms. *See Terrance*, 286 F.3d at 843 ("'[W]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'") (quoting *Mandel v. Doe*, 888 F.3d 783, 789 (11th Cir. 1989)).

An unspecified guard at the housing unit contacted Fletcher a third time when Galvan-Casas found him unconscious on the floor of his cube. For the purposes of this appeal, Fletcher concedes that the guard informed her that Dominguez was found

unconscious. Despite this new information, Fletcher informed the guard that Dominguez's care would have to wait another twenty-five minutes—until her arrival at 7:00 p.m.

Dominguez made his second trip to the medical unit at 6:55 p.m. At that time, Fletcher contacted Dorr, who instructed her to treat and monitor Dominguez in an air-conditioned environment. Nonetheless, after providing Dominguez with water and ice, Fletcher left Dominguez with a non-medical corrections officer so that she could continue passing out medication to other prisoners. Considering Dominguez's condition, we believe that this too demonstrates serious disregard to Dominguez's medical needs.

We further agree with the district court's determination that Fletcher was aware of the substantial risk that heat exhaustion and/or heat stroke posed to him, but she was indifferent to the serious risk of that harm. The district court correctly noted five separate times when Fletcher's actions could have been found to be deliberately indifferent:

> (1) telling Dominguez and . . . Galvan-Casas at sometime between 3:30 p.m. and 3:45 p.m. that she would first examine Dominguez at around 7:00 p.m. . . . after dismissing as "irrelevant" a [guard's] report that Dominguez was "suffering from heat exhaustion"; (2) knowing when she examined Dominguez at 4:10 p.m. that he was suffering from a "Suspected Heat Related Illness," vomiting in her presence, sweating profusely, light-headed and dizzy with resolved arm numbness, and unable to catch his breath, yet simply concluding that he was "probably mildly dehydrated" and "just needed to increase his fluids," giving Dominguez a small glass of water (knowing he was vomiting) and two aspirins, and sending Dominguez back to his cell . . . while an air conditioned holding cell in the medical unit remained unoccupied; (3) instructing a 6:35 p.m. caller regarding Dominguez's continuing dizziness that she would see Dominguez at the 7:00 p.m. medication lines; (4) again instructing a 6:45 p.m. caller reporting that Dominguez was vomiting water he attempted to drink that she would see him at 6:55 p.m. when she arrived for her medication line duties; and (5) applying ice packs to Dominguez while he remained in his wheelchair instead of placing him on a gurney.

(Dist. Ct. Op. 16, JA 545.) Thus, we conclude that a reasonable jury could determine that the totality of the circumstances demonstrates deliberate indifference on the part of

Fletcher, allowing Dominguez to meet his first burden in overcoming Fletcher's qualified immunity defense.

>    *2.     Clearly Established Right*

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [she] is doing violates that right.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)).

Fletcher does not contest that Dominguez was entitled to medical care and attention under the Fourteenth Amendment. In *Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005), this Court recognized that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Id.* at 313 (citations omitted). As applied to this case, Dominguez's right to adequate medical care has long been clearly established. Therefore, we conclude that Dominguez has satisfied both requirements for overcoming Fletcher's qualified immunity defense.

**C.     Immunity Under Michigan Law**

Michigan law offers government officers or employees immunity from tort liability under certain circumstances. Mich. Comp. Laws § 691.1407(2). Government employees are immune if they are acting or reasonably believe they are acting within the scope of their employment, are engaged in the discharge of the government function, and their "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." *Id.* Section 691.1407(2)(c) defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.*

The parties do not dispute that Fletcher was acting within the scope of her authority and was engaged in the discharge of her government function. Therefore, we consider only whether Fletcher's conduct amounted to gross negligence that was the proximate cause of Dominguez's injury. The Michigan Supreme Court has determined

that in order to be the proximate cause of the injury or damage, a defendant's conduct must be "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 311 (Mich. 2000). In defining proximate cause under section 691.1407(2), the *Robinson* Court specifically overruled its prior decision in *Dedes v. Asch*, 521 N.W.2d 488 (Mich. 1994) and found that proximate cause in section 691.1407(2) did not include simply "a proximate cause." *Id.* In *Robinson*, the court applied its definition of proximate cause to conclude that police officers in pursuit of an underage driver who was driving recklessly were immune from liability for injuries caused to the driver's innocent passengers. *Id.* at 319. The court reasoned that the reckless conduct of the fleeing driver was the proximate cause of the injuries to the passengers, not the officers' decision to chase the driver or their actions during the pursuit. *Id.*

We find that Michigan's immunity statute is not fatal to Dominguez's state law claim. Based on the facts of this case, we are unable to conclude that Fletcher's actions were not the proximate cause of Dominguez's injury. Unlike the scenario in *Robinson*, where reckless drivers were still involved in the activity at the time of the injury, Dominguez's health continued deteriorating long after he ceased exercising. Rather, after feeling dizzy he repeatedly sought medical help from Fletcher. In fact, Fletcher had multiple opportunities to provide adequate medical care and to, in all likelihood, prevent Dominguez's injuries. As such, this Court affirms the district court's decision that Fletcher is not entitled to summary judgment on Dominguez's gross negligence claim under Michigan law.

## IV. CONCLUSION

For all of the above reasons, we **AFFIRM** the decision of the district court denying Fletcher summary judgment based on qualified immunity and immunity from tort liability under Michigan Law.