**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0444n.06**

No. 19-3937

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BONITA STEWART, As Administratrix of the Estate on behalf of Justin Cory Stewart, | ) ) ) | **FILED**<br>Jul 30, 2020<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| WARREN COUNTY BOARD OF COMMISSIONERS, et al., | ) ) ) | ON APPEAL FROM THE UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| Defendants, | ) ) | |
| SOLUTIONS COMMUNITY COUNSELLING AND RECOVERY CENTERS, INC., JENNY EPLING, LPC, and JON RANDOL, | ) ) ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE: DAUGHTREY, GIBBONS, and MURPHY, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. In 2016, Bonita Stewart's adult son, Justin, experienced severe mental health issues. Worried that Justin's mental health issues might lead to "something worse," Bonita contacted authorities, believing "the system could help."[1] While in the Warren County Jail ("Jail") awaiting transfer to a treatment facility, Justin grew severely anxious about how long he would be confined. A state-court judge tentatively approved a plan for Justin to live with his uncle and participate in outpatient mental health treatment, but Justin was not made

---

[1] To avoid confusion, this opinion refers to members of the Stewart family by their first names: Bonita, Joseph, and Justin.

aware of that plan and scheduling mishaps prevented scheduling of a hearing to formalize that plan. Increasingly anxious and depressed about his incarceration, Justin committed suicide.

Bonita sued Solutions Community Counseling and Recovery Centers, Inc. ("Solutions"), a private contractor responsible for the mental health of inmates in the Jail, as well as two Solutions employees, Jenny Epling and Jon Randol,[2] alleging they violated her son's civil rights. The district court granted Solutions, Epling, and Randol summary judgment. We affirm.

I.

In 2013, Bonita Stewart's son, Justin Stewart, moved back to his hometown and accepted a position as a wholesale insurance salesman for his father's insurance company, Ohio Public Risk. Justin's mental health deteriorated rapidly after he started at Ohio Public Risk. He became convinced, incorrectly, that another employee was stealing from the company and persisted in this belief even after being proven wrong. Because Justin was unable to stop arguing with other employees, Joseph asked him to leave the company until he could correct his behavior. Joseph urged Justin to get mental health treatment.

On the night of November 2, 2014, still upset over his dismissal from Ohio Public Risk, Justin broke into his parents' home and damaged the house and his father's car. Joseph and Bonita were in Florida at the time and Justin called them to confess. When they returned home from Florida, Joseph called the police to report the incident. Justin appeared at the house while police were investigating. Joseph and Bonita asked the police to arrest Justin because they believed Justin needed mental health counseling. They paid Justin's bail the next day. Because police found a firearm in Justin's car when he was arrested, he was charged with and pled guilty to the improper

---

[2] Bonita initially brought suit against many more defendants, including the Warren County Board of Commissioners, Warren County Sheriff, and several corrections officers. All defendants except Solutions, Epling, and Randol were dismissed earlier in the litigation. At oral argument, counsel for the defendants informed us that Jon Randol passed away during the pendency of this appeal. Randol's estate, however, has not been substituted.

handling of a firearm in a motor vehicle, a felony. In July 2015, state judge Robert Peeler placed Justin on probation, the terms of which required Justin to seek mental health treatment and anger management counseling.

In April 2016, Justin's probation officer, Amy Bidinger, alleged that Justin had not complied with this condition of probation. Justin attended only two of five scheduled therapy sessions and never underwent anger management counseling. Justin was placed in the Warren County Jail based on a warrant issued for his violation of probation, and he was ordered to undergo a competency evaluation. Justin declined to participate in the competency evaluation, believing he had no mental health problems. Because Justin was uncooperative, the evaluator could not say whether Justin had a mental illness or was simply experiencing an isolated episode of depression. Justin's unwillingness to cooperate with mental health professionals left the evaluator skeptical that inpatient treatment would be successful. Nevertheless, the evaluator referred Justin to inpatient evaluation at Summit Behavioral Healthcare ("Summit").

Justin underwent inpatient treatment at Summit for twenty days in June 2016 but continued to insist he had no psychiatric illness or suicidal thoughts. Summit diagnosed Justin with narcissistic personality disorder, noting that, while Justin was in the facility, he antagonized, condescended, and provoked fights with many other patients while simultaneously denying wrongdoing. After determining that Justin was competent to stand trial, Summit discharged Justin back to the Warren County Jail. Joseph testified that Justin told him that "if they ever send me back to Summit, I'll kill myself." DE 80, J. Stewart Dep., Page ID 1299. Joseph did not report this comment to anyone at the time.

In July 2016, Judge Peeler ordered Justin to undergo an examination by Dr. Kara Marciani. To Marciani, Justin expressed a desire to participate in outpatient treatment and "return to the

community and obtain gainful employment." DE 73-1, Marciani Rep., Page ID 799. Marciani diagnosed Justin with Delusional Disorder, Persecutory Type and noted that he appeared to be "suspicious bordering on paranoid." *Id.* at 808. She recommended inpatient treatment but was skeptical it would succeed.

On August 8, 2016, Judge Peeler held a hearing and concluded, based on Marciani's report, that Justin should be transferred to an inpatient treatment facility. Justin was to be returned to the Jail until he could be placed in a treatment facility. Following the hearing, Justin became increasingly upset. Joseph saw that Justin appeared depressed when Justin left the hearing. Similarly, Bonita "sensed depression and anxiety" in Justin, DE 79, B. Stewart Dep., Page ID 1233, and she began noticing that Justin had "a sense of hopelessness" about being released from incarceration, *id.* at 1238.

Meanwhile, Bidinger tried, unsuccessfully, to find Justin an inpatient treatment facility. Jon Randol, the Crisis Coordinator for Solutions, evaluated Justin to see if he met the criteria for involuntary commitment, but found that Justin did not because he was "not suicidal or homicidal." DE 73-1, Randol Email, Page ID 812. Summit was not an option because of its "lengthy wait time" for "non-emergent forensic cases." DE 73-1, Chamberlain Email, Page ID 815. Bidinger also unsuccessfully tried to place Justin at The Lindner Center.

Because Justin could not be placed in an inpatient treatment facility, Judge Peeler "tentatively approved of a plan for Justin Stewart to be released to the care of his uncle" and receive outpatient treatment from Solutions. DE 84-2, Bidinger Aff., Page ID 1520. A hearing on that plan could not be scheduled until Justin's uncle agreed to care for Justin, which he did on August 22, 2016. Unfortunately, Bidinger was on her honeymoon that week, so Judge Peeler did not

schedule a hearing. Because a hearing was never scheduled, neither Justin nor his attorney were notified about a hearing on this plan.

In the Jail, Justin grew increasingly anxious about his continued incarceration. On August 12, 2016, Justin was placed in administrative segregation because he "constantly disrupt[ed] the whole pod," and "constantly yell[ed] and [was] defiant." DE 73-1, Administrative Segregation Rep., Page ID 813. On at least one occasion Justin repeatedly yelled the word "forever." Soon after Justin was placed in administrative segregation, Jenny Epling, Solutions's Boundary spanner in the Jail, had Justin seen by Dr. Lucas Barton, Solutions's medical director. At his visit with Barton on August 15, 2016, Justin declined a formal assessment and denied suicidal thoughts.

While in administrative segregation, Justin would frequently decline to make use of recreation time, and, on August 19, 2016, he apparently declined his food tray. On August 22, 2016, Epling checked on Justin as part of her weekly administrative segregation checks. She had not reviewed the shift logs before conducting her check. Justin said that he did not have any mental health needs. Because Epling understood the purpose of administrative segregation checks to be "to make [her]self available to inmates who were in a more secured pod," "once a week," to see "if they needed anything," rather than a full mental health evaluation, DE 72, Epling Dep., Page ID 596–97, Epling moved on after Justin told her he did not have any mental health needs. *Id.* at 646. Epling did not check on Justin after August 22, 2016.

On August 29, 2016, Justin called his parents. Both Joseph and Bonita became concerned Justin might harm himself because Justin "started talking about how he loved us in sort of a final sounding voice, like somebody saying good-bye." DE 80, J. Stewart Dep., Page ID 1300. But Joseph and Bonita put those concerns out of their minds when Justin began discussing future plans with them. On August 30, 2016, Justin committed suicide in jail.

5

Bonita sued Epling, Randol, and Solutions on Justin's behalf. In addition to Epling and Randol, Bonita deposed Dr. Russell Dern, Solutions's Executive Director.

The depositions included a discussion of Solutions's training procedures and, specifically, the training Epling received. Epling has a master's degree in counseling and is both a Licensed Professional Counselor and a Licensed Independent Chemical Dependency Counselor. Before working for Solutions, Epling had never conducted mental health assessments of inmates nor had she previously conducted administrative segregation checks. Epling could not recall all of the training she received after being hired by Solutions. She did recall, however, receiving health officer training, which included "making sure that you understand the suicide risk assessment, making sure that you understand what a 72-hour hold is, understanding the process for calling the hospitals, [and] understanding the laws surrounding the 72-hour hold." DE 72, Epling Dep., Page ID 656. She also remembered that Randol trained her to perform administrative segregation checks by instructing her verbally to "do rounds once a week to make [her]self available to inmates who were in a lock-down situation." *Id.* at 598. She did not see any written policy or procedure on how to conduct the checks.

Randol was Epling's supervisor at Solutions but was only at the Warren County Jail for a few hours each week. He testified that he and Epling attended a weekly meeting with jail administrators about inmates. Randol explained Epling's job as follows:

> Her function is to do all of the—to review the 10-minute and 20-minute suicide watches and determine whether or not they stay on watch or come off of watch.
>
> She also does what we call 12-day screenings, which is a general one-page mental health screening for inmates that have been in the jail up to 12 days. We typically don't get folks that are in there for 24 hours because it takes us a little longer to get to them, but that position does all of those screenings.

DE 73, Randol Dep., Page ID 725. Of administrative segregation checks, Randol said "we go in once a week, ask each inmate if they would like to talk to mental health. If they do, then we spend time with them. If they don't, which they normally don't, we just say that we asked." *Id.* at 734.

Dern said Epling's training included: "Health officer training, training in documentation in our own electronic health record. . . . Typically, we have clinicians—any new clinicians shadow a supervisor and/or appear to learn the job." DE 74, Dern Dep., Page ID 847. He added that there was "a suicide assessment tool that's used to determine [an inmate's] level of risk" and "to make recommendations for level of supervision or placement." *Id.* at 836.

After hearing Epling's description of the purpose of administrative segregation checks, Dern explained that her answer was incomplete. Specifically, Dern added that the purpose of the checks was also "[t]o collect information about inmates on administrative segregation [in order] to make recommendations about their continuing in administrative segregation or change to another level of supervision within the jail or to make a recommendation about transfer to inpatient care." *Id.* at 848–49. Dern added that a boundary spanner should "perform at least an informal assessment as to the inmate's mental health needs to determine whether or not some further intervention is necessary." *Id.* at 849. Still, Dern explained that a boundary spanner was not required to review other documents before performing administrative segregation checks.

Solutions, Randol, and Epling moved for summary judgment. In response, Bonita provided an affidavit from Dr. Raymond Patterson, an expert witness who concluded that "Randol and Epling did not perform adequate mental health assessments, mental status examinations, adequate suicide risk assessments, or rounds." DE 84-1, Patterson Aff., Page ID 1490. Patterson faulted Solutions's staff for not conducting administrative segregation checks in private spaces, failing to

perform an administrative segregation check for over a week after August 22, 2016, and failing to look at jail logs or incident reports pertaining to Justin.

The district court granted summary judgment in favor of Solutions, Epling, and Randol. While the district court explained that Bonita had satisfied the objective component of the deliberate indifference test under the Eighth Amendment, it found that Bonita could not satisfy the subjective component because Epling and Randol lacked a culpable state of mind and Solutions had not "failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." DE, Order Granting Summ. J., Page ID 1616–18, 1619–23 (quoting *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015)). The district court declined to exercise supplemental jurisdiction over Bonita's state law claims.

## II.

To prevail in her 42 U.S.C. § 1983 suit, Bonita must demonstrate that Epling, Randol, and/or Solutions deprived her son of a right protected by federal law or the Constitution while acting under color of state law. Because "private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983," Bonita can prevail against Epling, Randol, or Solutions if she can show they violated Justin's rights under federal law. *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018).

Bonita alleges Epling, Randol, and Solutions violated Justin's Eighth Amendment right to be free from cruel and unusual punishment. That right is violated when jail officials—including private medical professionals contracted by the jail—act with deliberate indifference to an inmate's serious medical needs. *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014). The deliberate indifference standard includes both an objective and subjective prong. *Id.* The

objective component requires a showing of "the existence of a 'sufficiently serious' medical need," while the subjective component requires a showing "that defendants 'perceived facts from which to infer substantial risk to the prisoner, that [they] did in fact draw the inference, and that [they] then disregarded that risk." *J.H. v. Williamson County*, 951 F.3d 709, 722–23 (6th Cir. 2020) (alterations in original) (quoting *Hopper v. Plummer*, 887 F.3d 744, 756 (6th Cir. 2018)). The district court concluded that Bonita satisfied the objective component. We need not reconsider the objective component because Bonita cannot satisfy the subjective component with respect to any of Epling, Randol, or Solutions.

### A.

Bonita contends that Epling and Randol were deliberately indifferent to Justin's need for mental health treatment. "To prove deliberate indifference to [Justin's] serious medical needs, [Bonita] must 'demonstrate . . . that [Randol and Epling] perceived facts from which to infer substantial risk to the prisoner, that [they] did in fact draw the inference, and that [they] then disregarded that risk.'" *J.H.*, 951 F.3d at 722–23 (quoting *Hopper*, 887 F.3d at 756 (internal quotation marks omitted)). Of course, officials are unlikely to readily admit subjective knowledge, so Bonita can prevail even based on circumstantial evidence from which a jury could conclude Epling or Randol were aware of Justin's mental health needs. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). Indeed, the "very fact that the risk was obvious" might permit a jury to find that Epling and/or Randol were aware of a substantial risk to Justin. *Id.* (citation omitted). However, merely failing to follow Solutions policy, by itself, does not constitute deliberate indifference on the part of Epling or Randol. *See Meier v. County of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010). "[T]he subjective component of a deliberate indifference claim must be addressed for each [defendant] individually." *Phillips v. Roane County*, 534 F.3d 531,

542 (6th Cir. 2008) (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (alterations omitted)).

While Bonita "need not show that [Epling and Randol] acted with the very purpose of causing harm, [she] must show something greater than negligence or malpractice." *Winkler*, 893 F.3d at 891. We have previously equated the standard with recklessness. *Shadrick*, 805 F.3d at 737–38. In the prison suicide context, we have explained that a plaintiff must show the inmate demonstrated suicidal tendencies. *Perez v. Oakland County*, 466 F.3d 416, 425–26 (6th Cir. 2006). For example, in *Perez*, we held that where a mental health official repeatedly placed an inmate on elevated watch, a jury could find that the official "had the subjective knowledge, at least at times, that [the inmate] posed a risk of suicide." *Id.* at 425.

There is no evidence that Epling or Randol was aware that Justin was demonstrating suicidal tendencies. In each of Epling's administrative segregation checks of Justin, Justin told her that he did not need mental health treatment. Justin only interacted with Randol twice, denying suicidal thoughts in one instance and declining a mental health screening altogether in the second. Justin did tell his father, Joseph, that "if they ever send me back to Summit, I'll kill myself." DE 80, J. Stewart Dep., Page ID 1299. But Joseph did not report that comment to anyone. Randol testified that he reviewed some reports by other medical professionals who had assessed Justin, but none of those reports said that Justin was at risk of suicide. Epling thought it was important to have Justin seen by the Jail's psychiatrist after his return from Summit, but that alone does not suggest an awareness of a risk of suicide in the same way that we held placing an inmate on suicide watch did in *Perez*. Moreover, Justin denied experiencing suicidal ideation to the psychiatrist Epling had him visit.

Bonita insists that Epling and Randol "bur[ied] their heads in the sand" to avoid becoming aware that Justin posed a risk of suicide. CA6 R. 9, Appellant Br., at 30 (citing *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015)). To succeed on that theory, Bonita must show that Justin posed an "obvious" risk of suicide and that Epling or Randol "refused to verify 'underlying facts that [they] strongly suspected to be true.'" *Makdessi*, 789 F.3d at 133 (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)); *accord Dominguez*, 555 F.3d at 550.

Bonita cannot demonstrate that the risk of Justin committing suicide was "obvious" to Randol or Epling. Justin repeatedly declined mental health treatment. Marciani's report noted that Justin posed a risk of harm to others; she did not mention a risk of self-harm. And Justin denied to Barton that he thought about suicide. Justin's mother, brother, and uncle all said that Justin never threatened suicide. And the conduct that led Justin to be placed in the Jail and, later, in administrative segregation—destroying his parent's property, arguing with patients at Summit, and being disruptive in his pod—was aggressive behavior toward others, not self-harm.

Justin's behavior in August 2016 was most concerning but did not evince a risk of suicide. Justin regularly declined to use his recreation time, and the district court accepted as true that he skipped meals on August 19, 2016. Epling testified that "the jail actually had a policy that—I think it was three—I think it was three *meals* that they had to miss before we would use not eating [as a basis for placing an inmate on suicide watch]." DE 72, Epling Dep., Page ID 617–18 (emphasis added).[3] But failing to follow Jail policy does not, by itself, constitute deliberate

---

[3] The district court stated that "[j]ail policy required placing an inmate on suicide watch if he declined food for three days." DE 88, Order Granting Summ. J., Page ID 1617 n.7 (citing DE 72, Epling Dep., Page ID 618). But Epling testified that "the jail actually had a policy that—I think it was three—I think it was three meals that they had to miss before we would use not eating [as a basis for placing an inmate on suicide watch]." DE 72, Epling Dep., Page ID 617–18. The district court's mistake is understandable, as Epling also testified that, before placing an inmate on suicide watch "there has to be more, kind of, factors like—than just simply not eating. [Like], not eating and I haven't ate for three days." *Id.* at 618. Nevertheless, because we construe the facts in the light most favorable to Bonita, we assume the jail's policy was to place an inmate on suicide watch after skipping three consecutive meals.

indifference, *Meier*, 376 F. App'x at 529, nor does refusing meals on just a single day make it obvious that Justin was at risk of suicide.

Bonita argues that this assessment of Justin's apparent risk of suicide fails to consider the evidence in the light most favorable to her because it ignores the affidavit of her expert witness, Patterson. Specifically, Bonita believes the district court should have considered Patterson's opinion "that both Randol and Epling failed to meet professional and community standards in treating Justin." CA6 R. 9, Appellant Br., at 30. But, at best, Patterson's affidavit demonstrates that the risk that Justin would commit suicide was one that Epling and Randol "should have perceived but did not." *See Rouster*, 749 F.3d at 446 (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). That is not sufficient to satisfy the deliberate indifference standard's subjective component. *Id.*

There is no evidence that either Randol or Epling was aware of a risk that Justin would commit suicide. Given that neither Justin's family nor the mental health professionals who saw him believed Justin was at risk of suicide, we cannot conclude that the risk that Justin would commit suicide was obvious. Accordingly, we affirm the district court's decision granting summary judgment to Epling and Randol.

B.

Bonita also argues that Solutions was deliberately indifferent to the risk that Justin would commit suicide by failing to properly train its employees; namely, Epling and Randol. While Epling's testimony about the training and supervision she received at Solutions raises some concern, Bonita cannot prevail merely by demonstrating that Epling was unsatisfactorily trained. *Shadrick*, 805 F.3d at 738. Instead, Bonita must demonstrate that the training Solutions offered was inadequate as a product of Solutions's indifference to inmates' rights, that a violation of

federal rights was "a highly predictable consequence" of the inadequate training, and that Justin's suicide was the result of, or at least closely related to, Solutions's inadequate training. *Id.* at 738–39 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). Because Bonita cannot satisfy this demanding standard, we affirm the district court's decision granting Solutions summary judgment.

Typically, a failure-to-train claim in the deliberate indifference context involves an entity's failure to take steps to remedy a pattern of repeated constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011). However, "plaintiffs can establish liability under a failure-to-train theory based on 'a single violation of federal rights, accompanied by a showing that [the entity] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.'" *J.H.*, 951 F.3d at 721 (quoting *Shadrick*, 805 F.3d at 738–39 (internal quotation marks omitted)).[4] Because there is no evidence that other inmates at the Jail committed suicide while the Jail contracted with Solutions, Bonita pursues the latter theory.

Bonita insists that this case is similar to *Shadrick v. Hopkins County*, where we found genuine issues of material fact regarding whether a private medical contractor's inadequate training of its staff demonstrated a deliberate indifference to an inmate's Eighth Amendment rights. 805 F.3d at 744. In *Shadrick*, an inmate, Tyler Butler, reported to jail with an MRSA infection so severe that a deputy sheriff was hesitant to even admit him. *Id.* at 729. While in jail, Butler developed a staph infection, vomited, lost control of his bowels, suffered severe pain, and

---

[4] Solutions contends that, because Bonita cannot demonstrate that Epling or Randol violated Justin's Eighth Amendment rights, her claim against Solutions necessarily fails. That is not quite correct. It is true that Bonita's claim fails absent a violation of Justin's Eighth Amendment rights. *J.H.*, 951 F.3d at 721. But we have previously explained that a municipality or entity *could* be liable for constitutional violations even where the municipality's employees themselves did not violate the plaintiff's constitutional rights. *North v. Cuyahoga County*, 754 F. App'x 380, 389 (6th Cir. 2018). That is because the municipality's policies, acts, and/or admissions, rather than an employee's conduct, occasioned the harm. *Id.* (citing *Winkler*, 893 F.3d at 900). Our conclusion that neither Epling nor Randol violated Justin's Eighth Amendment rights increases the likelihood that no underlying violation occurred, but it is not alone fatal to Bonita's claim against Solutions.

developed swollen and discolored joints. *Id.* at 729–32. Butler and jail officials repeatedly requested treatment, but nurses in the jail never reported the infection to the jail's medical director or sought emergency hospital care. *Id.* at 730–31. Indeed, Butler received no medication. *Id.*

We held that a jury could find that the jail's private medical contractor, Southern Health Partners, Inc. ("SHP"), was deliberately indifferent to Butler's Eighth Amendment rights. *Id.* at 739–40. First, we determined that the training SHP offered its nurses was inadequate. *Id.* at 739. In so doing, we noted that SHP provided the jail's nurses, all of whom were licensed practical nurses, only "limited on-the-job training" that did not include training on "assessing and documenting medical conditions of inmates, . . . monitoring patient progress, or providing necessary emergency care to inmates." *Id.* at 740. Additionally, the nurses were unaware of protocols or policies designed to guide their conduct, did not receive ongoing training, and did not receive regular feedback or evaluations from supervisors. *Id.* Second, we concluded that the inadequate training was the product of SHP's indifference to inmates' Eighth Amendment rights. *Id.* at 742. In so concluding, we noted that SHP's president failed to enforce the company's own policies and protocols for treatment of inmates before the inmate's death and failed to investigate the causes of Butler's death or discipline any staff following Butler's death. *Id.* at 742–43. Finally, we found that the inadequate training "actually caused, or was closely related to," Butler's death because Butler arrived at the jail with an "urgent need for medical treatment," yet SHP's "staff did not provide" medical treatment. *Id.* at 743–44.

Bonita fails to demonstrate the sort of deliberate indifference present in *Shadrick*. First, while in *Shadrick* SHP failed to train all of its licensed practical nurses, 805 F.3d at 734–36, here, Bonita can at most demonstrate that Epling alone was inadequately trained. But the subjective component cannot be met merely by showing that one employee was unsatisfactorily trained. *Id.*

at 738. Dern's description of a boundary spanner's responsibilities matches the training he says a boundary spanner should receive. That Epling's training—in one aspect of her job—fell short of what Dern stated the training entailed permits an inference only that Epling was unsatisfactorily trained.

Second, Epling's training was superior to that provided to SHP's nurses in *Shadrick*. Epling acknowledged that she received some training. Although she could not remember all the training she received, she did recall receiving health officer training, which included "making sure that you understand the suicide risk assessment, making sure that you understand what a 72-hour hold is, understanding the process for calling the hospitals, [and] understanding the laws surrounding the 72-hour hold." DE 72, Epling Dep., Page ID 656. Dern testified that Epling received "[h]ealth officer training [and] training in documentation in our own electronic health record," and he added that "any new clinicians shadow a supervisor and/or appear to learn the job." DE 74, Dern Dep., Page ID 847. Unlike in *Shadrick*, the training Epling received did include training on how to "assess[] and document[] medical conditions of inmates . . . monitoring patient progress, or providing necessary emergency care to inmates." *Id.* And, while Solutions lacked written protocols or policies, it did have a written "suicide assessment tool that's used to determine [an inmate's] level of risk" and "to make recommendations for level of supervision or placement." DE 74, Dern Dep., Page ID 836. That is far more training than the mere "on-the-job" training the nurses received in *Shadrick*. 805 F.3d at 740.

Solutions's training of Epling was superior to the training we found inadequate in *Shadrick*. Even if Epling's training was nevertheless inadequate, inadequate training of one employee is not enough to demonstrate deliberate indifference on the part of Solutions. Accordingly, we affirm the district court's decision granting summary judgment to Solutions.

III.

For the reasons provided above, the district court's judgment is affirmed.