RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0054p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SHERI TROZZI,

                              *Plaintiff-Appellant*,

      *v.*

LAKE COUNTY, OHIO; DANIEL DUNLAP, DIANE SNOW,
RYAN STAKICH, and SCOTT CAPRON, in their
individual and official capacities,

                            *Defendants-Appellees*.

No. 21-3685

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cv-00684—J. Philip Calabrese, District Judge.

Decided and Filed: March 29, 2022

Before: BATCHELDER, NALBANDIAN, and READLER, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:** Lewis A. Zipkin, Kevin M. Gross, ZIPKIN WHITING CO. LPA, Beachwood,
Ohio, for Appellant. Frank H. Scialdone, Kathleen M. Minahan, MAZANEC, RASKIN AND
RYDER CO., L.P.A., Cleveland, Ohio, for Appellees.

─────────────────

## OPINION

─────────────────

CHAD A. READLER, Circuit Judge. While being held in a county detention center,
Sheri Trozzi complained of abdominal pain to two correction officers and a jailhouse nurse.
Those officials responded to Trozzi's complaints but stopped short of calling 911. The next day,
a jail doctor examined Trozzi and sent her to a hospital, where she ultimately underwent surgery.

Invoking 42 U.S.C. § 1983, Trozzi sued the two officers and the nurse. According to Trozzi, the three were deliberately indifferent to her serious medical needs, in violation of the Fourteenth Amendment, due to their failure to call for emergency help after her initial complaints. The district court granted summary judgment to defendants. Examining Trozzi's claims under the modified deliberate indifference standard announced in *Brawner v. Scott County*, we affirm.

## I.

Following her arrest for suspected shoplifting, drug possession, and several traffic violations, Sheri Trozzi was detained at the Lake County Adult Detention Center. Five days after her arrival, Trozzi sought help with gastrointestinal health issues related to an earlier gastric bypass surgery. Those difficulties had caused doctors to place Trozzi on a specialized diet and prescribe her antacids to prevent ulcers. While in jail, Trozzi submitted two written requests: one for help filling her prescription drugs for her mental health, and another for an adjustment in her diet to promote healthy eating. Trozzi later disclosed to a mental health consultant that she was having "issues with an ulcer." The next day, Trozzi again asked for an adjustment to her diet and "to be put back on [her] stomach medicine" to "prevent[] ulcers," which, she noted, were "already beginning to develop." As a result of these requests, Diane Snow, the jail nurse, scheduled Trozzi to meet with a doctor.

In the wee hours of the morning of the day before her appointment, Trozzi began experiencing abdominal pain, prompting her to call from her cell for help. Corrections Officer Ryan Stakich responded, finding Trozzi doubled over in pain. Stakich notified his supervisor, Scott Capron, of Trozzi's condition. When Capron arrived, he instructed that Trozzi be taken to a medical holding cell for observation. Stakich retrieved a wheelchair to transport Trozzi while Capron took Trozzi's vital signs. Trozzi was administered an over-the-counter antacid to alleviate her stomach pain before being transported to the holding cell. With Trozzi's vital signs showing a normal heart rate, blood pressure, and blood oxygen saturation, Capron called Snow at home to apprise her of the situation. Snow advised Capron to continue monitoring Trozzi every 30 minutes until the next morning's sick call. According to Trozzi, after Stakich and Capron left, she became covered in her own urine, feces, and bloody vomit as she waited in her cell.

Several hours later, Snow visited Trozzi during a scheduled sick call. The parties diverge on what exactly transpired next. Trozzi, describing herself as "hysterical" and covered in human waste, maintains that Snow launched into a profanity ridden rant, telling her to shut up, sit down, and wait until the end of Snow's shift for any aid. When Snow returned a few hours later, adds Trozzi, she told Trozzi she was not calling 911, leaving Trozzi to wait for the next nurse to attend to her. Snow denies that she used any such language and that she did not assess Trozzi. Instead, Snow claims she took Trozzi's vital signs and found Trozzi to be stable, an indication that she was not suffering from serious pain. Given Trozzi's scheduled doctor visit the following morning, Snow opted to continue with Trozzi's monitoring in the medical holding cell and to continue providing her with over-the-counter antacids.

At a scheduled appointment the next day, the jail doctor, upon examining Trozzi, decided to send her to the hospital. There, Trozzi underwent surgery for a perforated ulcer.

Trozzi sued Stakich, Capron, and Snow under 42 U.S.C. § 1983, alleging that the three officials were deliberately indifferent by failing to attend to her serious medical needs, in violation of the Fourteenth Amendment. Trozzi also brought a *Monell* claim against Lake County and its then-Sheriff Daniel Dunlap, asserting that the county had a policy, practice, or custom that resulted in the alleged deliberate indifference by Stakich, Capron, and Snow. Defendants moved for summary judgment on the basis of qualified immunity. The district court concluded that Trozzi lacked evidence to show that any defendant violated her constitutional rights. And it found the *Monell* claim equally lacking due to the absence of an underlying constitutional violation. Trozzi's timely appeal followed.

**II.**

On appeal, Trozzi challenges only the district court's grant of summary judgment with respect to Stakich, Capron, and Snow, apparently accepting the dismissal of her *Monell* claim. *See Hardrick v. City of Detroit*, 876 F.3d 238, 244 (6th Cir. 2017) (holding that *Monell* claims ordinarily will not be addressed on appeal where the appellant fails to raise the issue in their opening brief). We review the district court's grant of summary judgment to Stakich, Capron, and Snow de novo, construing the evidence and drawing reasonable inferences in Trozzi's favor.

*Burwell v. City of Lansing*, 7 F.4th 456, 462 (6th Cir. 2021).  Summary judgment is appropriate when there is no genuine dispute of a material fact.  Fed. R. Civ. P. 56(a).  That occurs when no reasonable jury could find for the nonmoving party based on the evidence.  *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018).

## A.

Before addressing Trozzi's claims, we begin with a review of our evolving law governing deliberate indifference claims.  Starting from first principles, the Constitution "generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property interests."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  But "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."  *Id.* at 198.

One such instance concerns incarcerated individuals.  *Id.*  A prisoner's liberty deprivation renders him unable to "care for himself," thereby "just[ifying]" an affirmative duty of care for that prisoner.  *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) (citation omitted).  The Supreme Court unearthed this right from the Eighth Amendment's prohibition on cruel and unusual punishment.  And it determined if the right was violated by employing as a measuring stick the "evolving standards of decency that mark the progress of a maturing society," *see Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion), a constitutional barometer that today is largely repudiated, *see Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019) (recognizing that "cruel and unusual" should be interpreted  "as a reader at the time of the Eighth Amendment's adoption would have understood those words"); *see also Glossip v. Gross*, 576 U.S. 863, 899 (2015) (Scalia, J., concurring) (recognizing that *Trop* "has caused more mischief to our jurisprudence, to our federal system, and to our society than any other [case] that comes to mind" by "replac[ing] the judgments of the People with [the judiciary's] own standards of decency").  Before *Estelle*, these "evolving standards" had been understood to bar a state from imposing an "excessive" criminal sentence that offends "the dignity of man."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion) (quoting *Trop*, 356 U.S. at 100).  *Estelle* extended that right to prohibit the state from *failing* to act, such that inaction results in the "unnecessary and wanton infliction of pain," 429 U.S. at 104 (citation omitted), or is otherwise "repugnant to the conscience of

mankind," *id.* at 106 (quotation marks omitted).  Under that standard, negligent medical care does not amount to a constitutional violation.  *Id.*

Perhaps trying to stabilize *Estelle's* flimsy foundation, *Farmer v. Brennan* adopted a two-part test for when a prison official has an affirmative duty to protect a prisoner.  511 U.S. 825, 834 (1994).  First, the underlying deprivation suffered by the prisoner, measured objectively, must be sufficiently serious.  *Id.*  Second, the prison official's omission must be the product of a sufficiently culpable state of mind:  deliberate indifference.  *Id.*  Aligning deliberate indifference with the standard for criminal recklessness, *Farmer* held that a prison official cannot be found liable unless the official subjectively "knows of and disregards an excessive risk to inmate health or safety."  *Id.* at 837.  In so doing, *Farmer* rejected an objective test for deliberate indifference in line with civil recklessness, which the opinion defined as an individual's failing to act in the face of an "unjustifiably high risk of harm" that is either subjectively known to the individual or is "so obvious that it should be known."  *Id.* at 836–37.

**B.**

For many years, *Farmer's* two-prong test governed claims of inadequate medical care brought by pretrial detainees as well as convicted prisoners in this Circuit.  *Burwell*, 7 F.4th at 462–63.  But we recently shifted course in *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021).  There, we considered a pretrial detainee's argument that *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "eliminat[ed] the subjective element of a pretrial detainee's deliberate-indifference claim."  *Brawner*, 14 F.4th at 591.  *Kingsley* itself was a case about pretrial detainees' excessive force claims.  *See* 576 U.S. at 396 (refusing to decide whether its holding would apply in a case that does not involve an officer's intentional use of force).  To determine if the force used was "excessive," the Supreme Court explained, courts should employ an objective-only test.  *Id.* at 392.  At the same time, the act of force itself must be purposeful or knowing or perhaps even criminally reckless.  *Id.* at 396.

Our Circuit's application of the *Farmer* test has hardly been a model of consistency.  *Brawner v. Scott County*, 18 F.4th 551 (6th Cir. 2021) (Readler, J., dissenting from denial of rehearing en banc) (discussing our Circuit's inconsistent approach to deliberate indifference

medical need claims).  Against this backdrop, *Brawner* took on the unenviable task of trying to understand whether (and if so, how) *Kingsley* changed things, an issue that has divided our sister courts.  *Compare Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (holding that *Kingsley* altered the deliberate indifference standard); *Gordon v. County of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (same); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (same), *with Cope v. Cogdill*, 3 F.4th 198, 207 & n.7 (5th Cir. 2021) (rejecting that *Kingsley* changed the standard); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (same); *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) (same).  Ultimately, *Brawner* opted to apply *Kingsley*'s reasoning to claims alleging inadequate medical care.  But we stopped short of fully *eliminating* the subjective inquiry, as the plaintiff there pressed us to do.  *Brawner*, 14 F.4th at 591 ("Brawner argues . . . [*Kingsley*] eliminates the subjective element of a pretrial detainee's deliberate indifference claim").  Instead, *Brawner* explained, "*Kingsley* requires *modification* of the subjective prong of the deliberate-indifference test for pretrial detainees."  *Id.* at 596 (emphasis added).  Going forward, we are bound by *Brawner*'s views on this front.  *Greene v. Crawford County*, 22 F.4th 593, 607 (6th Cir. 2022).

So how did *Brawner* modify the subjective prong?  The answers seem to lie in two places: a paragraph at page 596 of the opinion and a single sentence on the following page.  *See Hyman v. Lewis*, --- F.4th ---, No. 21-2607, 2022 WL 682543, at *2 (6th Cir. Mar. 8, 2022) (distilling *Brawner*'s key "principles" from pages 596 and 597 of the opinion).  In a paragraph aiming to answer what is "required to establish deliberate indifference in this context," *Brawner* contains several guiding principles.  14 F.4th at 596.  The paragraph first defines "deliberate indifference" in the negative, stating that "[m]ere negligence is insufficient."  *Id.*  Next, quoting the objective civil recklessness test that *Farmer* rejected, *Brawner* observes that prison officials can be deliberately indifferent if they have "acted" "recklessly 'in the face of an unjustifiably high risk of harm that is . . . so obvious that it should be known.'" *Id.* (quoting *Farmer*, 511 U.S. at 836).  But the relevance of this latter sentence, with its focus on affirmative acts by prison officials, is not entirely clear.  After all, deliberate indifference claims and *Brawner* itself all concern acts a prison official does *not* take.  Then consider the paragraph's final sentence.  It indicates that a detainee "must prove" "less than subjective intent—something akin to reckless disregard." *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)

(en banc)).   The sentence, however, does not explain what the reckless-disregard standard entails.  Nor does it attempt to clarify, as alluded to in the preceding sentence, whether the new reckless-disregard standard extends beyond affirmative acts.  And the sentence's disavowal of "subjective intent" on its face does not depart from the *Farmer* standard.  *See* 511 U.S. at 835 (holding that deliberate indifference can be "satisfied by something less than acts or omissions for the very purpose of causing harm").  So both before and after *Brawner*, "subjective intent" is not the sole consideration of the deliberate indifference test.  And any broader departure from all inquiries into the defendant's personal knowledge is somewhat hard to square with the opinion's simultaneous declaration that it was only modifying the subjective inquiry.  14 F.4th at 596.  In all, this paragraph does not articulate a test for *Brawner*'s modified deliberate indifference standard.

That standard is found later in the opinion.  On page 597, *Brawner* addresses the plaintiff's specific claims.  And in so doing, the opinion articulates the modified subjective standard in a sentence only a lawyer could love:  the jail official must either act intentionally or "recklessly fail[] to act reasonably to mitigate the risk the serious medical need posed . . . even though a reasonable official . . . would have known that the serious medical need posed an excessive risk . . . ."  *Id.* at 597.  In the absence of any further explanation on how *Brawner* modified the *Farmer* test, our focus, it seems, should be on this sentence.

At the risk of "treat[ing] a judicial opinion as if it were a statute," *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (Posner, J.), we start with what is obvious about the sentence at hand:  the legally requisite state of mind is recklessness.  There is no instruction as to whether civil or criminal recklessness is at play, but the opinion does state that the recklessness must concern a failure to act with respect to mitigating certain medical risks.  The standard also introduces an objective inquiry through the rubric of a "reasonable official." *Brawner*, 14 F.4th at 597.  The "reasonable official" standard, however, does not directly modify the conduct of failing to act; instead, it is separately introduced as a measure of the nature of the underlying medical need.  *Id.*  All said, *Brawner*'s modification could fairly be read to suggest one of two things:  either (1) subjective considerations should be entirely ignored; or (2) the jail official's actual knowledge remains relevant, both as to his mindset with respect to his decision

making and as to whether a reasonable official, armed with that knowledge, would have known of a risk to the detainee.

Which is it? In this setting, we ordinarily might turn to sister circuits whom we joined in holding that *Kingsley* altered the *Farmer* test for pretrial detainees. But they are all over the map on this front. Some are even split within their own circuits on the relevance of the jail official's subjective mindset post-*Kingsley*. *Compare Gordon*, 888 F.3d at 1125 (applying an objective-unreasonableness test toward an inadequate medical care claim), *and Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (holding that a plaintiff can prevail by showing that prison officials "*should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health"), *with Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636–37 (9th Cir. 2021) (observing that an "inadvertent failure to provide adequate medical care" does not satisfy the "reckless disregard" standard (citation omitted)); *Darby v. Greenman*, 14 F.4th 124, 129 (2d Cir. 2021) (concluding that "mere medical malpractice is not tantamount to deliberate indifference" absent a showing of "*conscious* disregard of a substantial risk of serious harm") (emphasis added) (citation omitted); *Pittman ex rel. Hamilton v. County of Madison*, 970 F.3d 823, 827–28 (7th Cir. 2020) (Barrett, J.) (concluding that, post-*Kingsley*, an inquiry into the objective reasonableness of a prison official's action is a separate inquiry from whether the defendant acted "purposefully, knowingly, or . . . recklessly," the latter of which is shown when a prison official "'strongly suspect[s]' that [her] actions would lead to harmful results"); *McCann v. Ogle County*, 909 F.3d 881, 886–87 (7th Cir. 2018) (considering whether a defendant "foresaw or ignored the potential consequences of her actions" when deciding whether a defendant acted purposefully, knowingly, or recklessly). These dueling decisions shed little light on how we should proceed post-*Brawner*.

That leaves us to rely on any hints we can gather from *Brawner*, our post-*Brawner* decisions, and background principles. Doing so leads to an approach that takes account of a jail official's actual knowledge. Ignoring as much cannot be reconciled with *Brawner*'s assertion that it was merely *modifying Farmer*'s subjective prong for pretrial detainee claims. 14 F.4th at 593, 596. After all, if *Brawner* had adopted an unvarnished, objective-only inquiry, it would not have listed a two-part test, where part one is whether the detainee had an "objectively serious

medical need" requiring medical attention. *Id.* at 597; *Greene*, 22 F.4th at 607. Understandably then, our post-*Brawner* precedent continues to consider the jail official's personal knowledge when applying the deliberate indifference prong. *See, e.g.*, *Greene*, 22 F.4th at 613 (considering the jail official's "training" and "knowledge of [the detainee's] condition"); *Britt ex rel. Britt v. Hamilton County*, No. 21-3424, 2022 WL 405847, at *5 (6th Cir. Feb. 10, 2022) (examining what the prison official knew about a detainee's treatment plan); *cf. Westmoreland v. Butler County,* --- F.4th ---, No. 21-5168, 2022 WL 872729, at *5 (6th Cir. Mar. 24, 2022) (holding that for failure-to-protect claims a "defendant officer must act *intentionally* in a manner that puts the plaintiff at substantial risk of harm, without taking reasonable steps to abate that risk, and by failing to do so actually cause the plaintiff's injuries") (emphasis added). (To be fair, in *Westmoreland*, we at times described *Brawner* as requiring "only an objective showing" that a "defendant acted . . . or failed to act." *Westmoreland*, 2022 WL 872729, at *5; *see also id.* at *6 (describing the inquiry as "solely an objective consideration"); *but see id.* at *3–4 (addressing plaintiff's argument that *Kingsley* "eliminates" the subjective element and repeating *Brawner*'s holding that *Kingsley* only "modified" the standard). But the opinion's express holding imposes an intentionality requirement, which makes sense given *Brawner* and our post-*Brawner* case law that expressly avoids "eliminating" all but an objective inquiry and *Kingsley's* express preservation of a subjective component, as will be discussed below.)

Perhaps most importantly, a stand-alone reasonable-prison-official standard that wholly ignored the defendant's specific knowledge would be "tantamount to determining whether that official was negligent." *Brawner,* 14 F.4th at 609 (Readler, J., concurring in part and dissenting in part); *see also Westmoreland*, slip op. at 17–18 (Bush, J., dissenting) (explaining that interpreting *Brawner* as requiring an objective-only test is no different "from a mere negligence standard"); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (recognizing that *Farmer*'s subjective standard "is meant to prevent the constitutionalization of medical malpractice claims"). Yet both *Brawner* and *Kingsley* squarely rejected such a standard. *See* 14 F.4th at 596; *Kingsley*, 576 U.S. at 396. In fact, *Kingsley* recognized that the defendant's state of mind remains relevant with regard to the defendant's conduct, in contrast to the results of his conduct, which are judged under an objective-reasonableness test. 576 U.S. at 395–96. By analogy, a defendant who does not act when faced with objective evidence that a detainee has a serious

medical need must "possess a purposeful, a knowing, or possibly a [criminally] reckless state of mind" to be considered deliberately indifferent to the detainee's medical need. *Id.* at 396. Equally true, protecting pretrial detainees from all objectively serious medical risks that might arise in a jail finds no basis in the original understanding of the Fourteenth Amendment. *Cf. Kingsley*, 576 U.S. at 407 (Scalia, J., dissenting) (concluding that a pretrial detainee's right against the application of objectively unreasonable uses of force is not "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty" to warrant protection under the Due Process Clause's substantive component (citation omitted)); *see also Obergefell v. Hodges*, 576 U.S. 644, 726 (2015) (Thomas, J., dissenting) ("In the American legal tradition, liberty has long been understood as individual freedom *from* governmental action, not as a right *to* a particular governmental entitlement."). For these reasons, the post-*Brawner* deliberate indifference inquiry still requires consideration of an official's actual knowledge of the relevant circumstances.

## C.

Closing one door, however, opens another: when evaluating deliberate indifference, when and how should we consider what the jail official knew? *Brawner* partially answers that question; it disavowed our prior focus on whether the jail official actually knew that the pretrial detainee faced a risk of harm from a serious medical need. *See Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018). Modifying the standard, *Brawner* added an objective consideration. Borrowing from *Kingsley*, *Brawner* explained that a detainee raising a Fourteenth Amendment medical deprivation claim must show that a reasonable officer at the scene—not one "with the 20/20 vision of hindsight"—would have known the detainee's medical needs posed an excessive risk. *Kingsley*, 576 U.S. at 397. But otherwise, *Brawner* stopped short of fully articulating the deliberate-indifference inquiry. *See Britt*, 2022 WL 405847, at *6 (rejecting that *Brawner* fully examined all "aspects of the deliberate-indifference inquiry"). In fact, *Brawner* acknowledged as much. Rather than purporting to flesh out the revised deliberate indifference prong, the opinion instead merely provided its thoughts on what might be "relevant on remand" for the district court. 14 F.4th at 592.

*Greene v. Crawford County*, the decision that formally adopted *Brawner*'s standard as the law of the circuit, starts where *Brawner* stops. 22 F.4th 593. *Greene* considered inadequate-medical-care claims brought by a pretrial detainee who, while in custody, had exhibited obvious symptoms of delirium tremens before ultimately dying of respiratory failure. *Id.* at 598–99. In assessing whether a reasonable officer at the scene would have known the detainee's medical needs posed an excessive risk, we repeatedly considered, among other things, what the jail official knew about the detainee's condition. *Id.* at 609 (noting that one defendant "believed Greene to be going through alcohol withdrawal" and that he "knew" the inmate was not evaluated for the condition); *id.* at 610 (observing that another defendant "knew [from Greene's medical evaluation] that Greene was experiencing a medical issue"); *id.* at 611 (relying on evidence that a defendant "knew that Greene's condition had not improved overnight" and "[d]espite this knowledge" did nothing); *id.* at 612 (describing what another defendant personally "understood" to find deliberate indifference); *id.* (noting what another defendant "believed" about Greene's symptoms, what "she understood" about his condition, and her "acknowledge[ment] that it would be important for Greene to receive medical attention"); *id.* at 613 (concluding that an officer had not been deliberately indifferent because he was "not aware" of Greene's medical problems). And in so doing, we cautioned against using hindsight in the analysis. We instead looked to what the particular officer actually knew to gauge what a reasonable officer would have understood about the detainee's condition. *Id.* at 614; *see also Hyman*, 2022 WL 682543, at *2–3 (examining what a "reasonable officer in [the defendant's] position would have known" about the detainee's condition and considering whether the defendant "intentionally ignored [the detainee's] needs").

*Greene*'s analysis also hinged in large part on whether the prison official at issue understood the consequences of failing to respond to the detainee's objectively serious medical condition. For instance, in affirming summary judgment denials against several defendants who did not seek emergency medical care for the detainee, *Greene* considered both *Brawner*'s reasonable-officer inquiry as well as whether the individual defendants actually understood that their inaction would pose a serious risk to the detainee. *See, e.g.*, 22 F.4th at 609–12 (establishing several defendants' personal knowledge about the risks of inadequate care by noting their prior first-aid training for delirium tremens); *id.* at 610 (noting text messages

showing the defendant "recognized that [the detainee] needed to be seen by the jail nurse"); *id.* at 611 (noting the defendant's knowledge that the detainee had not received "any medication . . . or any basic medical assistance" to deny summary judgment); *id.* at 612 (observing that the defendant "knew that [the detainee] needed medical assistance . . . but nonetheless chose not to seek medical aid for [the detainee]"); *id.* at 613 (noting the defendant "had training as an EMT" and therefore should have known the risks associated with "not seeking any medical help or rendering any medical aid" to the detainee).  By the same token, in affirming summary judgment granted to another defendant, *Greene* rested its conclusion on the ground that the defendant did not have the knowledge or training on how to respond to delirium tremens.  *See id.* at 614 (noting that that the defendant "did not have knowledge of and did not receive any training on the medical treatment needed for an individual suffering from delirium tremens" and refusing to apply an objective test gauging what the defendant "should have" done in response to the situation).  In other words, after concluding the detainee had an objectively serious need, *Greene* employed a two-part inquiry: (1)  would a reasonable officer knowing what the particular jail official knew have recognized the detainee's serious medical needs; and (2) did the officer in question actually know about the risks posed to the detainee by the official's failure to act.  *See also Hyman*, 2022 WL 682543, at *3 (rejecting that a prison official was deliberately indifferent by examining "several reasons" the official provided for why he personally did not provide medical care to the detainee).

*Greene*'s approach is consistent with *Brawner*.  Recall that *Brawner*'s standard for deliberate indifference contemplates separate inquiries into whether the jail official (1) "recklessly failed to act" (2) "even though" a "reasonable official" "would have known" there was a serious medical need.  14 F.4th at 597.  And this view—bifurcating knowledge of the underlying conduct from knowledge about the detainee's medical needs—has its genesis in *Kingsley*, which recognized that constitutional due process claims include "two separate state-of-mind questions."  576 U.S. at 395.  One inquiry entails an objective inquiry into a "series of events in the world," while the other considers the defendant's actual intentions as to his own conduct.  *Id.* at 396.  Applying *Kingsley* in the context of an inadequate medical care claim, the latter state-of-mind question includes an inquiry into whether the defendant actually understood the consequences of failing to act.  In other words, just as a use of force in and of itself is

insufficient to demonstrate a constitutional tort, so too is simple inaction in the face of an objectively serious medical need insufficient to demonstrate deliberate indifference in violation of the Fourteenth Amendment. *Id.* (observing that if a police officer's Taser "goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim"). (And we recently imposed an even higher standard than criminal recklessness for failure-to-protect claims, requiring that a defendant officer "act intentionally." *See Westmoreland*, 2022 WL 872729, at \*5 (emphasis added)).

Reading *Farmer*, *Kingsley*, *Brawner*, and *Greene* together, a plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk. This third inquiry faithfully applies *Kingsley*, 576 U.S. at 396 (recognizing that liability for a constitutional tort, even one that includes an objective inquiry, must still be "purposeful or knowing" and that criminal "recklessness" might suffice (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998))), ensuring that there is a sufficiently culpable mental state to satisfy the "high bar" for constitutional torts grounded in a substantive due process violation. *Cf. Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020). In practice, that may mean that a prison official who lacks an awareness of the risks of her inaction (because, for example, another official takes responsibility for medical care, a medical professional reasonably advised the official to not act, the official lacked authority to act, etc.) cannot have violated the detainee's constitutional rights. *Doe*, 954 F.3d at 933–34 (discussing the "demanding rules" for the analogous deliberate-indifference standard for state-created danger claims).

## D.

With this standard in mind, we turn to Trozzi's deliberate-indifference claims. For today's purposes, all agree that Trozzi had an objectively serious medical need, meaning Trozzi

has satisfied prong one of the *Farmer-Brawner* test. That turns our focus to how the modified deliberate-indifference test applies to each defendant. *See Greene*, 22 F.4th at 607 (noting that we must "evaluate each defendant individually" under *Brawner*'s modified subjective prong (citation omitted)). Put another way, we must determine whether Trozzi has presented sufficient evidence for a reasonable jury to conclude that: (1) a reasonable officer (knowing what the particular jail official knew at the time of the incident) would have known she was suffering from a serious medical need that posed an excessive risk to her health; and (2) Stakich, Capron, or Snow knew that non-intervention would create an unjustifiably high risk of harm to Trozzi's health and ignored that risk.

**1. Stakich**. Trozzi argues that Stakich violated her constitutional rights by failing to call 911 after she reported stomach pain. Stakich's interaction with Trozzi was limited. He answered Trozzi's late night distress call, immediately notified his supervisor of Trozzi's complaints, and wheeled Trozzi to the medical holding cell. Stakich saw Trozzi doubled over, complaining of stomach pain, and, based on his supervisor's check of Trozzi's vitals, concluded that she did not need emergency care.

On this record, Stakich did not deny Trozzi's substantive due process right to medical care with deliberate indifference. Start with the first prong for deliberate indifference. It is difficult to conclude that a reasonable official in Stakich's position (without the benefit of hindsight) would have known Trozzi was suffering from a serious medical condition requiring immediate help. True, Trozzi testified that she had asked Stakich for her prescription medication. But that fact alone would not have alerted a reasonable officer that Trozzi used the medication to prevent ulcers or that her inability to take that medication had caused an ailment requiring emergency medical care. Nor would a detainee's complaint of serious stomach pain, standing alone, lead a reasonable official to seek outside, emergency medical help. *See Rouster v. County of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014) (holding that a failure to provide adequate treatment in response to a prisoner's complaints of stomach pain was not a constitutional violation). Especially so, it seems, when Trozzi's vital signs signaled she was not suffering from extreme pain. *See Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010)

(holding that a failure to provide adequate treatment in response to a prisoner's self-diagnosed ailments does not amount to a constitutional violation).

But we need not determine whether Trozzi could muster enough evidence on the first deliberate-indifference element as she squarely fails on the second. For Trozzi lacks evidence that Stakich actually knew of any unjustifiably high risks of failing to call 911. As a starting point, because Stakich lacked any authority to make such a call, it is quite likely that Stakich did not even consider the consequences of such an action. Either way, Stakich did not *ignore* Trozzi. Far from it, in fact. Stakich took affirmative actions to help Trozzi—he called his supervisor and helped transport Trozzi for medical care. Perhaps Stakich should have pursued more serious intervention. At most, that failing amounts to negligence. Far more is required to establish a constitutional violation. *See Brawner*, 14 F.4th at 596; *Greene*, 22 F.4th at 614.

**2. Capron**. Trozzi's claim against Capron fares no better. After Stakich alerted Capron to Trozzi's self-reported pain, Capron took four actions: he (1) placed her in a medical holding cell for regular observation; (2) took her vital signs; (3) consulted Snow as to whether Trozzi needed further medical attention; and (4) gave Trozzi an over-the-counter antacid.

Trozzi faults Capron for not taking the additional step of calling 911. But the failure to do so is not tantamount to deliberate indifference. Starting with the first element, no reasonable officer in Capron's position would have thought Trozzi was suffering from a serious medical need. Unlike Stakich, Capron was not told about Trozzi's request for her prescription medicine. And while Capron was made aware of Trozzi's self-reported stomach pain, her vital signs were stable. Based on those vital signs, Snow counseled Capron that Trozzi did not have any serious medical needs. Having received a diagnosis from a medical professional, no reasonable officer in Capron's position would be expected to second guess that diagnosis. *See Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (noting that if medical professionals were unable to recognize that a detainee needed medical care, it could not have been apparent to a lay officer).

Even if Trozzi satisfied this first element, she would fail to satisfy the second, as there is no evidence that Capron viewed his failure to call 911 as creating unjustifiably high risks to Trozzi. Capron testified that he relied on Snow's instructions, which did not include calling for

emergency help, an indication that he was unaware of any risks associated with not calling 911. *See Greene*, 22 F.4th at 608 (recognizing "that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions" (cleaned up)).  And like Stakich, Capron aided Trozzi by providing her with medication and regular monitoring.  Capron may have misjudged the situation.  But like her claims against Stakich, Trozzi's criticism of Capron boils down to a mere difference of opinion about the proper course of treatment.  That is not enough to establish deliberate indifference under *Brawner*'s modified approach.  *See Greene*, 22 F.4th at 614; *see also Darby*, 14 F.4th at 129 (holding that post-*Kingsley* "a difference of opinion about the proper course of treatment" "does not demonstrate deliberate indifference").

Citing to *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005), Trozzi argues that even if little evidence shows that either of the officers was *subjectively* deliberately indifferent, a "strong showing on the objective component" can create a genuine issue of material fact to defeat summary judgment.  *Estate of Carter*, however, has little import in a world where the subjective prong no longer directly parallels the objective prong's focus on the risks posed by the detainee's medical needs.  Where, as is true today, the "modified subjective prong" instead considers whether the detainee's medical need would have been apparent or detectable to a reasonable official at the scene armed with the defendant's actual knowledge, *Brawner*, 14 F.4th at 596, the modified second prong is a different inquiry than prong one of the *Farmer* test, which considers the severity of the detainee's medical need—not its detectability, *see Lumbard v. Lillywhite*, 815 F. App'x 826, 832 (6th Cir. 2020) (describing *Farmer*'s first prong as asking whether "an objective layman would deem the [detainee's medical] condition serious"); *Gunther v. Castineta*, 561 F. App'x 497, 500 (6th Cir. 2014)  ("[A] medical need is serious [under the first prong of *Farmer*] if the average person would surely deem it to be one that required professional treatment.").  True, a deliberate-indifference claim still requires a defendant's actual knowledge of the risks arising from non-intervention.  But even a strong showing that the detainee needed medical attention does not necessarily tell anything about a prison official's state of mind with respect to the need to intervene.

**3. Snow**.   Trozzi also claims that Snow's failure to call 911 amounted to deliberate indifference.  For support, she points to two events during her detention:  (1)  Snow's provision of medical advice to Capron over the phone in the middle of the night; and (2) Snow's visit with Trozzi the next morning.

The claim against Snow raises a closer constitutional question.  As compared to Stakich and Capron, Snow had greater knowledge of Trozzi's condition:  she knew of Trozzi's history with ulcers and her prescription medication, which led her to schedule an appointment for Trozzi with a jail doctor.  And unlike the others, Snow is a medical professional with the knowledge and training to diagnose an individual who claims to be suffering from stomach pain.  *See Greene*, 22 F.4th at 614 (applying *Brawner* and considering inquiries into the defendant's state of mind, including a prison official's professional background, in assessing deliberate indifference).  Trozzi's testimony, moreover, paints Snow in a dim light.  According to Trozzi, Snow was aware of Trozzi's medical history and saw Trozzi covered in her own bodily fluids after repeatedly complaining of stomach pain, yet still "did nothing" for Trozzi and made her wait for further care.  Yet those allegations are tempered by other undisputed facts.  For instance, Snow knew that Trozzi's vital signs were normal, ordered that she be given over-the-counter antacids, and placed Trozzi under close monitoring.

But we need not decide whether Snow's decision not to seek immediate emergency help for Trozzi amounted to a constitutional violation.  For when that same conduct "does not violate clearly established . . . [federal] rights of which a reasonable person would have known," it is not necessary to decide whether a constitutional violation occurred.  *Pearson v. Callahan*, 555 U.S. 223, 231, 236 (2009).  In other words, finding that Snow did not violate a clearly established right is a separate ground by which we may affirm the district court.  *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 886 (6th Cir. 2020) (observing that we may affirm on any grounds supported by the record even if different from the reasons of the district court).

Turning, then, to the clearly established inquiry, qualified immunity is appropriate unless the officer in question had "fair notice" that her conduct was unlawful.  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).  To provide such notice, the scope of the constitutional right must be "sufficiently clear that every reasonable official would have understood that what

[she] is doing violates that right." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). Whether the official had such notice is "judged against the backdrop of the law at the time of the conduct." *Brosseau*, 543 U.S. at 198. Critically, we do not define clearly established law at a "high . . . level of generality." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). While a case need not be "directly on point for a right to be clearly established," the burden is on the plaintiff to show that closely analogous precedent has placed the "constitutional question beyond debate." *Cunningham v. Shelby County*, 994 F.3d 761, 764 (6th Cir. 2021) (quoting *White v. Pauley*, 137 S. Ct. 548, 551 (2017) (per curiam)).

As an initial observation, we agree with Trozzi that pre-*Brawner* case law—that is, cases that consider whether the government official was subjectively aware of the detainee's serious medical issues—is the appropriate focus for determining what constitutional rights are clearly established. After all, a change in the law (such as *Brawner*) that occurs after the official's conduct is "of no use in the clearly established inquiry." *Brosseau*, 543 U.S. at 200 n.4. This view joins that of the majority of our sister circuits who have held that *Kingsley* modifies the *Farmer* test. *See Balsewicz v. Pawlyk*, 963 F.3d 650, 657 & n.5 (7th Cir. 2020); *Ross v. Corr. Officers John & Jane Does 1-5*, 610 F. App'x 75, 77 n.1 (2d Cir. 2015). *But see Sandoval v. County of San Diego*, 985 F.3d 657, 672 (9th Cir. 2021).

With an eye on pre-*Brawner* precedent, we turn to the case Trozzi identifies to carry her burden with respect to clearly established law. She describes *Dominguez v. Correctional Medical Services*, 555 F.3d 543 (6th Cir. 2009), as providing Snow with "fair and clear warning" that the law prohibited her conduct. In *Dominguez,* we denied a prison nurse's motion for summary judgment, holding that a reasonable jury could find that she was deliberately indifferent to a prisoner's medical needs, which ultimately led to his paralysis when the nurse failed to provide him with any medical care. *Id.* at 546–48, 552. Dominguez's ordeal began when a prison officer called a nurse to report that Dominguez was suffering from heat exhaustion. *Id.* at 546. The nurse did not instruct the officer on how to care for Dominguez, noting that she would check on him later that day. *Id.* at 546, 551. When the nurse arrived at the jail, she was again summoned by an officer and told that Dominguez's condition had worsened.

*Id.* at 546–47. When she eventually examined Dominguez, she observed him vomiting and sweating profusely, and he told her that he had been lightheaded and dizzy, his arm was numb, and he was having trouble breathing. *Id.* at 546–47. The nurse advised Dominguez to return to his unairconditioned room, drink water, and take aspirin. *Id.* at 547, 551. Later that day, the nurse was called by another officer (for the third time) when the officer found Dominguez unconscious in his cell. *Id.* at 547. She provided the officer with no instruction as to how to care for Dominguez, other than telling him to give Dominguez some water; rather, she advised that she would see him when she arrived nearly 30 minutes later. *Id.* at 547, 551–52. Before she arrived, yet another officer called to tell her that Dominguez vomited again. *Id.* at 547, 551–52. To that, she simply repeated that she would see Dominguez when she arrived at the jail. *Id.* at 547, 552. We ultimately concluded that a reasonable jury could conclude, based on the "totality" of these events, that the nurse was deliberately indifferent toward Dominguez's medical needs. *Id.* at 552.

Trozzi reads *Dominguez* as establishing a broad proposition that trained medical professionals who make inmates wait for several hours for medical treatment exhibit deliberate indifference. Like the district court, however, we view the case as factually distinguishable from Trozzi's. The prison nurse there knew that Dominguez was suffering from heat exhaustion and had lost consciousness, saw him exhibit objective symptoms of that illness, yet provided him with no medical care. But here Snow did not know if Trozzi had a serious internal injury or merely a non-emergent stomach ache. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam) ("The qualified immunity analysis thus is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question." (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017))). True, Snow knew that Trozzi had a history of ulcers for which she was prescribed medication. But, according to Snow's testimony, she believed ulcers did not raise a serious medical concern unless they were unattended to for "months on end." Nor did Snow witness Trozzi exhibit objective symptoms of an emergent medical problem. To the contrary, Snow knew that Trozzi's vitals were normal, and she had not observed Trozzi vomit. And, unlike the nurse in *Dominguez*, who gave prison guards no instruction as to how to care for the inmate, Snow scheduled a doctor's appointment for Trozzi and instructed Capron to monitor Trozzi every 30 minutes and provide her antacids. Finally, Snow knew that a jail doctor would

examine Trozzi the next day.  In *Dominguez*, on the other hand, the nurse knew she was the sole medical professional to evaluate the inmate.  Whatever rule *Dominguez* establishes as to its extreme facts, that rule does not implicate the facts of this case.

Due to these considerable factual differences, *Dominguez* did not put Snow on notice that the course of treatment she chose for Trozzi's symptoms violated the Constitution.  *See Cunningham*, 994 F.3d at 766 (requiring the plaintiff to identify "existing precedent that squarely governs the specific facts and circumstances of this appeal that would have given [the defendant] fair notice that [her] conduct [was] unlawful").  As a result, Snow is entitled to qualified immunity.

*       *       *       *       *

We affirm the judgment of the district court.